NICHOLAS T. O'NEILL, Plaintiff-Appellant, *v.* JEANNETTE DE LANEY
*et al.*, Defendants-Appellees.

First District (5th Division) Nos. 79-460, 79-685 cons.

Opinion filed December 31, 1980.

George C. Pontikes and Sheldon Gardner, both of Foss, Schuman & Drake, of Chicago, for appellant.

L. Louis Karton, Ltd., of Chicago, for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

In this action for declaratory judgment (Ill. Rev. Stat. 1979, ch. 110, par. 57.1) plaintiff seeks a declaratory judgment that he is the owner of a valuable painting. Essentially, plaintiff maintains that the painting was sold to him by James Paul DeLaney on August 18, 1970. A cloud over plaintiff's title was created in 1974 when defendant Jeannette DeLaney, in her divorce action against her husband James Paul DeLaney, claimed "special equities" in the painting as marital property. Plaintiff filed this action to end that controversy. Following a bench trial, the trial court found the purported sale of the painting from James Paul DeLaney to plaintiff was void because of inadequate consideration and lack of delivery. On appeal from that judgment, Jeannette DeLaney is the sole appellee.

Defendants were married on January 17, 1953. Approximately three to five years later, they acquired a painting allegedly the work of Peter Paul Rubens and entitled "Hunting of the Caledonian Boar" (hereinafter the painting). This painting was a part of the art collection acquired by the defendants during their marriage. In 1966, defendants moved into an apartment building in which the plaintiff and his wife resided. The two couples soon became friends. Jeannette DeLaney characterized the friendship between plaintiff and her husband as "casual" for the next four years. After 1970, however, she noticed that plaintiff and her husband had become close friends, and in fact, the two couples went on a vacation together.

On August 18, 1970, James Paul DeLaney purportedly sold the painting to plaintiff for $10 and "other good and valuable consideration." A written contract, embodying the terms of the agreement, was prepared and signed by plaintiff and James Paul DeLaney. Jeannette DeLaney was not a party to that contract. The painting was then brought to plaintiff's apartment where it was hung on the wall.

When asked what the contract term "other good and valuable consideration" meant to him, plaintiff stated:

"That to me and Mr. DeLaney means our friendship and favors that we have done; and as you put it earlier, the love and affection that one had for another. Mr. DeLaney didn't have any children, and I assume he looked upon me as a son."

Under cross-examination, plaintiff was asked whether he gave James Paul DeLaney anything else other than $10 and love and affection in exchange for the painting. Plaintiff responded: "No, not really."

At the time of the sale of the painting, plaintiff believed it was worth $100,000 if not authenticated as a Rubens original, and if authenticated, several hundred thousand dollars. James Paul DeLaney told plaintiff the

painting was a genuine Rubens. Plaintiff, however, had no formal education in art and had no experience in art research.

During the next four years, plaintiff stated that the painting was either in his apartment or in DeLaney's. The painting apparently never remained in plaintiff's apartment for a sustained period of time. Since James Paul DeLaney was plaintiff's agent for the purpose of selling the painting, it was kept in DeLaney's apartment to be viewed by prospective buyers. Both plaintiff and DeLaney felt the painting's value would be enhanced if viewed by prospective buyers with the rest of the DeLaney art collection. Also, plaintiff considered the painting to be safer in DeLaney's apartment. Despite plaintiff's concern for the safety of the painting, he never insured the painting during this period.

According to Jeannette DeLaney, the painting hung on the south wall of the sunroom of their apartment during the years 1970 to 1974. It was only removed from the apartment for art exhibitions and restoration work. At no other time was she aware that the painting was outside her apartment.

Mrs. DeLaney denied that she was ever informed by her husband that the painting had been sold to plaintiff. Nor did plaintiff mention this transaction to Mrs. DeLaney. She stated that she first became aware of plaintiff's claim of ownership in 1974 during the course of her divorce proceedings.

Irving Friedin, a friend of the plaintiff, visited plaintiff's apartment approximately 40 to 50 times during the period from August 1970 to December 1974. On one of those visits, he recalled seeing the painting inside the plaintiff's apartment.

In Jeannette DeLaney's complaint for divorce, filed in 1974, she claimed "special equities" in the painting and prayed for an equitable share thereof. Although plaintiff was, in his own words, a good friend of the DeLaneys, he was unaware of the marital problems confronting the couple or that Mrs. DeLaney had filed for divorce. On December 19, 1974, Mrs. DeLaney obtained an injunction enjoining her husband from transferring or encumbering the title to the painting. In an affidavit, filed January 8, 1975, on behalf of James Paul DeLaney, plaintiff stated that the painting had been placed in storage on December 12, 1974. More specifically, plaintiff stated: "On or about December 12, 1974, I personally examined certain works of art *owned and possessed by Mr. James Paul DeLaney* and assisted in their placement in certain vaults on the premises of Reebie Storage and Moving Company, Inc." (Emphasis added.) Identified as one of these works of art was the painting allegedly sold to plaintiff on August 18, 1970.

After a full hearing on May 11, 1976, the trial court, which was hearing the divorce action, found the purported sale of the painting by

James Paul DeLaney to plaintiff void. According to the trial court, this hearing was conducted on "the Petition of NICHOLAS T. O'NEILL which petition was in fact a motion by JAMES PAUL DeLANEY for the release of a certain painting presently held under a court injunctive order at the Reebie Storage and Moving Co., Inc., said motion on behalf of defendant [James Paul DeLaney] having been previously filed on behalf of the defendant in April, 1975 and continued from time to time for hearing." The degree of plaintiff's participation in that hearing is unclear from this record.

Five weeks after that hearing, on June 21, 1976, plaintiff initiated this action for declaratory judgment against James and Jeannette DeLaney. Prior to trial, several additional parties were allowed to intervene to assert a claim or interest in the painting; the factual basis for these claims is not relevant to our decision.

Defendant James Paul DeLaney filed an answer admitting all of plaintiff's allegations, and especially that he transferred title of the painting to the plaintiff on August 18, 1970. The answer of defendant Jeannette DeLaney denied that title to the painting had transferred to plaintiff. Additionally, she affirmatively pleaded the May 11, 1976, order, finding the purported sale by Mr. DeLaney to plaintiff void, as a bar under the doctrine of res judicata to the present action. Following a bench trial, the trial court found that the contract purporting to transfer title to the painting to plaintiff was void because of "inadequate consideration" and "inadequate delivery." Finally, we note that the present action was transferred to, and tried before, the trial court which was hearing the DeLaney divorce action.

OPINION

Before we may reach the substantive issue of the validity of the contract, two threshold issues lie before us. First, defendant Jeannette DeLaney maintains that this action is barred under the doctrine of res judicata by the trial court's order of May 11, 1976, in the divorce proceeding. That order contained an explicit finding that the contract selling the painting to plaintiff was void. In general, the doctrine of res judicata provides that a final judgment on the merits rendered by a court of competent jurisdiction constitutes an absolute bar to a second adjudication where there is identity of parties, subject matter, and cause of action. (*Bass v. Scott* (1979), 79 Ill. App. 3d 224, 398 N.E.2d 236.) This bar extends not only to issues actually litigated, but to those which could have been decided in the former adjudication. (*Bass v. Scott.*) The judicial doctrine of res judicata has two separate prongs: one, estoppel by judgment and two, estoppel by verdict, or as it is more frequently referred to as collateral estoppel. (*City of Evanston v. G. & S. Mortgage & Invest-*

*ment Corp.* (1973), 11 Ill. App. 3d 642, 297 N.E.2d 331.) Defendant, Jeannette DeLaney, seeks to impose the collateral estoppel branch of res judicata as a bar to this action. When the same parties or their privies are involved with the same issues, which were actually or necessarily finally determined by a court of competent jurisdiction, in an earlier, but different, cause of action, the second action is barred under the doctrine of collateral estoppel. (*Riley v. Unknown Owners* (1975), 25 Ill. App. 3d 895, 324 N.E.2d 78.) A party asserting the bar of collateral estoppel bears the burden of establishing that defense by clear and convincing evidence. *Gale v. Transamerica Corp.* (1978), 65 Ill. App. 3d 553, 382 N.E.2d 412.

Plaintiff responds to this argument by stating that he was not a party or privy to the divorce proceedings in which the May 11, 1976, order was rendered. Although persons not before the court are not ordinarily bound by a decree, persons who participate in an action through their attorneys may be bound by the judgment even though not formal parties. (*Hall v. Humphrey-Lake Corp.* (1975), 29 Ill. App. 3d 956, 331 N.E.2d 365.) Our review of this record does not find sufficient evidence of plaintiff's participation in the previous adjudication on May 11, 1976, to allow defendant to raise the bar of collateral estoppel. The record before us contains only two references to the May 11, 1976, order. In her answer to plaintiff's complaint for declaratory judgment, defendant Jeannette DeLaney affirmatively pleaded the May 11, 1976, order as a bar to this action. She attached a copy of that order to her pleading. In the order, the trial court made only one reference to the plaintiff's participation in that proceeding. The trial court stated the hearing was conducted on "the Petition of NICHOLAS T. O'NEILL, which Petition was in fact a motion by JAMES PAUL DE LANEY, for the release of a certain painting presently held under a court injunctive order at the Reebie Storage and Moving Co., Inc. said motion on behalf of defendant having been previously filed in behalf of the defendant in April, 1975 and continued from time to time for hearing." Apparently, plaintiff filed a petition in the trial court to determine his interest in the painting; however, in the eyes of the trial court, the proceedings were instituted and prosecuted upon the motion of the defendant James Paul Delaney.

■■ A second reference to the May 11, 1976, order was made by counsel for Jeannette DeLaney during his closing argument in the declaratory judgment action. Counsel tried to argue that the issue of the validity of the sale contract between plaintiff and James Paul DeLaney was previously decided by the trial court's order in the divorce proceeding on May 11, 1976. An objection was made by plaintiff's counsel on the basis that plaintiff was not a participant to the proceeding. Sustaining the objection, the trial court indicated that, at the very least, plaintiff's counsel was not present at the previous proceeding. On this murky record, we cannot say

that defendant has proven by clear and convincing evidence that plaintiff actively participated in or otherwise submitted himself to the May 11, 1976, proceeding. Therefore, plaintiff is not barred by that order.

■■ Next, the plaintiff claims that defendant Jeannette DeLaney as a third party to the sale contract of August 18, 1970, lacked standing to challenge its validity. This argument ignores the ·underlying basis of plaintiff's action: Plaintiff claims he acquired title to the painting by virtue of a valid and enforceable sales contract executed August 18, 1970. By commencement of this action, plaintiff has made the validity of this contract an issue and defendant had a right to challenge that proposition. Moreover, defendant Jeannette DeLaney has a significant and direct interest in the validity of the contract. Since the painting was purchased during her marriage to James Paul DeLaney, she may have a significant marital interest in this property. Having surmounted these preliminary issues, we must now determine whether the trial court properly found the sales contract to be void for lack of delivery or inadequate consideration.

An offer, an acceptance, and consideration are the basic elements of a contract. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 371 N.E.2d 634.) Consideration to support a contract is any act or promise which is of benefit to one party or disadvantage to the other. (*Steinberg v. Chicago Medical School.*) Whether there is consideration for a contract is a question of law for the court. (*Lesnik v. Estate of Lesnik* (1980), 82 Ill. App. 3d 1102, 403 N.E.2d 683.) Generally, courts will not inquire into the sufficiency of the consideration which supports a contract. (*Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 356 N.E.2d 67.) However, where the amount of the consideration is so grossly inadequate as to shock the conscience of the court, the contract will fail. (*Bonner v. Westbound Records, Inc.* (1979), 76 Ill. App. 3d 736, 394 N.E.2d 1303.) The adequacy of consideration for a contract is to be determined as of the time of entering the contract. (*Elliott v. Northern Trust Co.* (1913), 178 Ill. App. 439.) Evidence of this gross inadequacy of consideration has been considered by some Illinois courts as tantamount to fraud. (*E.g., Smith v. Smith* (1930), 340 Ill. 34, 172 N.E. 32; *Till v. Till* (1967), 87 Ill. App. 2d 358, 231 N.E.2d 641.) Professor Corbin in his treatise on contracts explained the underlying analysis employed by courts to strike down contracts for grossly inadequate consideration as follows:

> "The gross inadequacy of the consideration, as measured by the opinions of other men, may tend to support the conclusion that the parties did not actually agree upon an exchange, that the 'peppercorn' [a term signifying a useless and valueless item used as consideration] was not in fact bargained for by the promisor. If it was not bargained for, it was not a consideration, according to the definition that makes agreed bargain the test. Persons sometimes

say that they have bargained, when their other conduct shows that they have not; and they sometimes actually bargain for something when their written or oral statement is that they have bargained for something else. * * * The rule that market equivalence of consideration is not required, and that the value of the consideration is to be left solely to the free bargaining process of the parties, leads in extreme cases to absurdities. When the consideration is only a 'peppercorn' or a 'tomtit' or a worthless piece of paper, the requirement of consideration appeared to Holmes [Mr. Justice Oliver Wendell Holmes in *Krell v. Codman* (1891), 154 Mass. 454, 28 N.E. 578] to be as much of a mere formality as is a seal." (1 Corbin on Contracts §127, at 546 (1963).)

In such extreme cases, Professor Corbin concluded that "the stated consideration is a mere pretense" (Corbin, §127, at 546-47), and no contract exists. This analysis of contract law can also be seen in those cases which have examined the attempts of one spouse to transfer marital property prior to either divorce or death, and thereby defeat the marital interests of the other spouse.

■■ Generally, a spouse has an absolute right to dispose of his or her property during marriage without the concurrence of the other spouse. (*Demos v. Demos* (1972), 8 Ill. App. 3d 906, 290 N.E.2d 304.) Moreover, the spouse may do so even if the transfer is made for the express purpose of minimizing or defeating the marital interests of the surviving spouse. (*Lesnik v. Estate of Lesnik* (1980), 82 Ill. App. 3d 1102, 403 N.E.2d 683.) There is only one exception to this rule: when the transaction is merely "colorable" or "illusory" and is tantamount to fraud. (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 383 N.E.2d 185; *Holmes v. Mims* (1953), 1 Ill. 2d 274, 115 N.E.2d 790.) This fraud, as explained by our supreme court, relates to the absence of a present intent to transfer title and ownership of the property, not the presence of an intent to defeat the marital interest or right of the other spouse. (*Johnson v. La Grange State Bank.*) From this premise, the supreme court explained the type of illusory or colorable transactions which will not be upheld by the courts:

"[A]n illusory transfer is one which takes back all that it gives, while a colorable transfer is one which appears absolute on its face but due to some secret or tacit understanding between the transferor and the transferee the transfer is, in fact, not a transfer because the parties intended that ownership be retained by the transferor. * * *.
* * *

Although the spouse's marital rights can be defeated by an actual transfer, a purported transfer whereby the owner does not intend

to convey a present interest, but intends to retain ownership, is evidence of an intent to defraud." (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359-60, 383 N.E.2d 185, 193.)

In summary, the purported transfer of property by one spouse during marriage will only defeat the interests of the other spouse if the transfer is real and actual. If, however, the transfer does not, in fact, convey a present interest or title to the property, it will not receive the approval of the courts. The determination of whether a transfer is real or illusory or colorable involves an examination of the totality of the facts. (See *Page v. Keeves* (1935), 362 Ill. 64, 199 N.E. 131.) Certainly, the adequacy of the consideration and the conduct of parties are particularly relevant to this inquiry.

■■ In the present case, the painting was purportedly sold to the plaintiff on August 18, 1970, for $10 and other good and valuable consideration. Plaintiff expressly testified that "other good and valuable consideration" meant the love and affection plaintiff and James Paul DeLaney had for one another. In Illinois, love and affection does not constitute legal consideration. (*E.g., Lesnik v. Estate of Lesnik* (1980), 82 Ill. App. 3d 1102, 403 N.E.2d 683.) Thus, the only remaining valid consideration for the transaction was the tender of $10. As we noted above, the adequacy of the consideration must be determined as of the time of entering the contract. (*Elliott v. Northern Trust Co.* (1913), 178 Ill. App. 439.) Plaintiff stated that at the time he purchased the painting, it was worth $100,000 if not authenticated and several hundred thousand dollars if authenticated as an original Rubens. James Paul DeLaney told him at the time of transfer that the painting was an original Rubens. A purchase price of $10 for such a valuable work of art is so grossly inadequate consideration as to shock the conscience of this court, as it did the trial court's. (See *Bonner v. Westbound Records, Inc.* (1979), 76 Ill. App. 3d 736, 394 N.E.2d 1303.) To find $10 valid consideration for this painting would be to reduce the requirement of consideration to a mere formality. This we will not do. By finding this to be inadequate consideration, we are not trying to protect one party against a bad deal entered into voluntarily, but rather are questioning the existence of the alleged contract. (See Corbin, §127, at 546.) Additional evidence exists to support our conclusion that no contract of sale transferring title and ownership of the painting to plaintiff exists here.

First, we turn to the conduct of the plaintiff. During the course of the divorce proceedings between the DeLaneys, plaintiff filed an affidavit on behalf of James Paul DeLaney. In his affidavit, plaintiff stated that: "On or about December 12, 1974, I personally examined certain works of art *owned and possessed by Mr. James Paul DeLaney* and assisted in their placement into certain vaults on the premises of Reebie Storage and

Moving Co., Inc." (Emphasis added.) One of the paintings, identified by plaintiff in his affidavit, "owned and possessed by Mr. James Paul DeLaney," was the Rubens painting which is the subject of this lawsuit. Thus, four years after the purported sale of this painting to plaintiff from DeLaney, plaintiff stated that the painting is "owned and possessed" by James Paul DeLaney. Plaintiff's own statement casts serious doubt over his claim that a valid sales contract had been executed.

Another element of plaintiff's conduct which bears examination is his failure to insure the painting. Plaintiff knew the painting was worth at least $100,000 and had a potential value of several times that amount, and yet, plaintiff failed to insure the painting. This circumstance draws greater attention when viewed with plaintiff's testimony that he was concerned about the safety of the painting. According to plaintiff, one of the reasons the painting was often kept in DeLaney's apartment was to insure its safety. One would certainly expect that the owner of a valuable and irreplaceable painting, who was concerned about its safety, would obtain insurance against loss.

Next, we note that during the four-year period from the sale of the painting until the commencement of the divorce action, neither James Paul DeLaney nor plaintiff informed, or ever mentioned, to Jeannette DeLaney that this valuable work of art had been sold to plaintiff. While there was no duty upon either James Paul DeLaney or plaintiff to inform Jeannette DeLaney, it stretches credibility to believe that among such good friends no mention of this supposedly honest and open sale had taken place. Their silence speaks loudly in this case.

Finally, there is the physical location of the painting after the sale to plaintiff. The painting, according to plaintiff, was in his apartment for the next four years except for those occasions when it was to be viewed by prospective buyers in the DeLaney apartment. In contrast to this testimony, Jeannette DeLaney stated that the painting hung on the south wall of the sunroom of their apartment throughout this period. She never noticed its absence except for those occasions when the painting was part of an art exhibition or was being restored. The trial court, as trier of fact, obviously chose to believe the testimony of Jeannette DeLaney on this point. We also find it difficult to believe that Jeannette DeLaney would not have noticed any unexplained absences of this important and valuable work of art.

■■ We hold that no valid sales contract existed between plaintiff and defendant James Paul DeLaney. Both the grossly inadequate consideration and the conduct of plaintiff and James Paul DeLaney demonstrate that this sales contract was colorable and a mere pretense. No present

intent to transfer title to the painting to plaintiff existed here. Accordingly, the order of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.