EDWARD C. ADAMS, Plaintiff-Appellee, v. THE LOCKFORMER COMPANY, Defendant-Appellant.

First District (5th Division)   No. 86—2268

Opinion filed March 4, 1988.

94

Robert E. Mann and Joan McAvinn Gale, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

James P. Chapman, of James P. Chapman & Associates, Ltd., and Janet F. Gerske, both of Chicago, for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Defendant, The Lockformer Company (Lockformer), appeals from two orders entered by the circuit court of Cook County in favor of plaintiff, Edward C. Adams (Adams), in an employment contract dispute. In the first order, the jury found that Lockformer had breached a three-year oral contract of employment with Adams, and the court entered judgment thereon. In the second order, the court granted Adams' motion for a directed verdict on Lockformer's counterclaim against him for an alleged breach of his fiduciary duties as an employee of the corporation. On appeal, Lockformer argues that: (1) the alleged contract was not supported by sufficient consideration; (2) the contract was barred by the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 1 et seq.) because it was incapable of being performed within one year; (3) the trial court erred in granting Adams' motion for a directed verdict on its counterclaim; and (4) the trial court erred in permitting testimony as to the witnesses' "understanding" of the contract. For the reasons set forth below, we affirm.

Lockformer is a company engaged in the business of manufacturing and selling roll-forming machinery and other machinery related to the heating, ventilating and air-conditioning business. It is located in Lisle, Illinois. In 1973, Lockformer hired Adams as a sheet metal welder supervisor. In 1981, after a number of promotions, Adams became Lockformer's vice-president of manufacturing.

In June 1981, Lockformer was in a state of transition as a result of its president's unexpected resignation. At the same time, Lockformer's director of engineering, Robert Heilman, and vice-president of engineering, Leo Gale, began discussing setting up their own business to manufacture and market a traverse duct connector cleat (later called the "Quikduc") used in building construction to connect sections of duct work; the cleat was an alternative to a "more labor intensive-method of connector" known as a four-bolt system. To accomplish their goal, they needed sources to manufacture a machine to produce the cleat and to sell it. They invited Adams to become a participant in the venture. The group (referred to as the Chicago group) subsequently contacted two parties in California interested in the venture, Arthur Vlastnik, Lockformer's West Coast sales representative, and his friend, David Daw, who had previously worked for a company called Ductmate. Heilman proceeded to form the Illinois corporation

of Quikduc, Inc.; he, Gale and Adams became the company's officers and shareholders. Gale and a patent lawyer began preparations to determine the patentability of the cleat which, if obtained, was to be placed in Daw's name. The group also conducted a number of other preparatory activities, such as opening a bank account in the name of Quikduc, preparing a *pro forma* monthly projection of income from operations, obtaining price quotations from other companies concerning the making of component parts for the cleat, conducting market research, etc. Vlastnik and Daw also formed a company in California called Quikduc of California, Inc. It was anticipated that the two companies would enter into a joint venture or partnership arrangement. During this time, Gale also contacted Harley Flagler, the owner of Flagler Corporation, a competitor of Lockformer's, to inquire about purchasing the company for the purpose of manufacturing the machine to produce the cleat. Flagler refused to sell but the parties began negotiating for a partnership between Flagler and the Chicago group.

In December, Gale traveled to California to negotiate an agreement with Vlastnik and Daw, but no agreement was reached. Gale returned to Illinois and subsequently met with Adams and Heilman. What transpired at the meeting is disputed. Gale testified the group decided they would remain with Lockformer, since they had been unable to obtain any agreements with Flagler or Vlastnik and Daw, that they would disclose their activities to Lockformer's new president, Arthur Link, on January 4, 1982, and that they would attempt to secure written contracts of employment. Adams' version was that the three agreed Gale would retire, he and Heilman would resign from Lockformer, and the group would pursue the Quikduc venture.

The day before the group's anticipated meeting with Link, however, the Quikduc venture was revealed to him by Vlastnik. Vlastnik allegedly told Link that the "deal" between the California and Illinois Quikduc companies had "fallen apart." When the group met with Link the next day, Link immediately advised them that he had been informed of their venture. What transpired after that is disputed. According to Lockformer, Heilman raised the issue of written employment contracts, which Link summarily rejected, stating that the board of directors would not approve them. Heilman, apparently concerned about his continued position with Lockformer, then expressed his concern that Link would leave the company, Link assured him he would be with the company for at least three more years, and Heilman and Adams stated that such an arrangement suited them. Lockformer further contended that no contract of employment was ever offered to

Adams and that he was never asked to give up his interests in the Quikduc venture. Adams, on the other hand, asserted that Link in fact agreed to his specific request for a three-year employment contract as vice-president of manufacturing on the condition that he, like Gale and Heilman, "get rid of Quikduc and Flagler." Subsequently, the parties divested themselves of their interests in Quikduc.

On August 2, 1982, approximately eight months later, Adams' employment at Lockformer was terminated. On December 6, 1982, Adams filed a six-count complaint against Lockformer, alleging, among other things, Lockformer's breach of the three-year oral contract of employment entered into between the parties on January 4, 1982. Lockformer filed an answer and a counterclaim in which it asserted that Adams had breached his fiduciary duties to the corporation. Subsequently, two counts of Adams' complaint were dismissed pursuant to an agreed order. The court dismissed three additional counts pursuant to a motion for summary judgment filed by Lockformer, but it denied the motion as to count I of Adams' complaint which sought damages for breach of the alleged three-year oral contract of employment. The court also denied a renewed motion filed prior to trial by Lockformer to dismiss count I of the complaint on the grounds of lack of consideration and the Statute of Frauds.

Trial of the action commenced on April 30, 1986, and, at the close of plaintiff's case, Lockformer's motion for a directed verdict, based on lack of consideration and the Statute of Frauds, was denied. At the close of all the evidence, Lockformer renewed its motion and it was again denied. Adams' subsequent motion for a directed verdict on Lockformer's counterclaim for his alleged breach of fiduciary duties was granted. On May 8, 1986, a verdict was returned by the jury in Adams' favor and judgment entered thereon. On July 16, 1986, Lockformer's post-trial motions seeking judgment notwithstanding the verdict or a new trial were denied. This appeal followed.

I

That there was sufficient evidence to support the jury's determination that an oral agreement did exist between the parties does not appear to be an issue. The real issues raised by Lockformer are whether the asserted oral agreement lacked sufficient consideration to result in a binding contract and whether the oral agreement was enforceable under the Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 1 et seq.).

It is axiomatic that a contract must be supported by sufficient consideration to be enforceable. (*Moehling v. W. E. O'Neil Construc-*

*tion Co.* (1960), 20 Ill. 2d 255, 170 N.E.2d 100.) In the present case, Lockformer argues that: (1) the relinquishment of another job opportunity, here Adams' ownership rights in a potential business, does not constitute valuable consideration; (2) even assuming Adams gave up his ownership rights in another business, as a fiduciary of Lockformer he had an obligation to do so as a condition of continued employment with it and, therefore, his action did not constitute a detriment sufficient to provide consideration; and (3) Adams in fact had no interest to give up at the time the alleged contract was made because any interest he had was worthless, and the jury's finding to the contrary was against the manifest weight of the evidence. We disagree.

■ In support of its first argument that relinquishment of another job opportunity does not constitute valuable consideration, Lockformer relies on *Ladesic v. Servomation Corp.* (1986), 140 Ill. App. 3d 489, 488 N.E.2d 1355. We find *Ladesic* inapplicable to the case before us. In *Ladesic*, the court held that foregoing another employment opportunity by an employee in exchange for a promise of *permanent employment* does not constitute valid consideration. In so holding, the court pointed out that in such a situation the employee merely promises to give his employer the "retention of a valuable employee" without sacrificing or surrendering anything of value in reliance on the employer's promise. The instant case, however, does not involve a promise of *permanent employment*, nor the foregoing of a *similar employment position*. Instead, Adams relinquished his interest in the Quikduc product and the Quikduc/Flagler venture. In other words, he, unlike the *Ladesic* plaintiff, sacrificed and surrendered an interest other than an employment position in reliance on Lockformer's oral promise of a three-year employment contract. Under these circumstances, therefore, the oft repeated rule that "[a]ny act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract" is applicable. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 330, 371 N.E.2d 634.) Here, giving up his Quikduc interest was a disadvantage to Adams and, therefore, sufficient consideration to support the parties' employment contract.

■ We also reject Lockformer's second alternative argument that Adams, as a fiduciary of the company, was required by law to give up his interest in a competing business (Quikduc) and, accordingly, such action did not constitute a detriment sufficient to provide consideration. Although we recognize that the performance by a party of a duty that he is already required to perform does not constitute consideration for a contract (*J & R Electric Division of J. O. Mory Stores,*

*Inc. v. Skoog Construction Co.* (1976), 38 Ill. App. 3d 747, 348 N.E.2d 474), that is not the situation here. Adams had a legitimate right to go so far as to form a rival corporation and outfit it for business while still employed by Lockformer; he was only precluded from going beyond preliminary competitive activities and commencing business as a rival concern while still employed by Lockformer. (See *Voss Engineering, Inc. v. Voss Industries, Inc.* (1985), 134 Ill. App. 3d 632, 481 N.E.2d 63.) Lockformer presented no evidence that Adams went beyond preliminary activities in pursuit of the venture or that Quikduc commenced business while he was still employed by Lockformer. Thus, even as a fiduciary of Lockformer, Adams was not required by law to give up his interest in Quikduc and his doing so constituted a detriment to him sufficient to provide consideration for the employment contract.

Moreover, the record discloses that Lockformer was not in the business of producing the machine to make the Quikduc product or the cleat itself which the group contemplated producing and selling and, therefore, the venture was not even in competition with Lockformer. We further observe that the fact that the group was negotiating for a partnership with Flagler, who was a competitor of Lockformer, does not bring Adams' involvement in the venture into the arena of competition with Lockformer since the machine to produce the cleat and the cleat itself were not at the subject time being manufactured by Lockformer. Had the Quikduc/Flagler partnership been formed and business commenced, of course, Adams could not have continued to be employed by Lockformer at the same time, but, we note, not because of Flagler's production of the machine to produce the cleat *per se*, but because Flagler was a competitor of Lockformer with respect to other products manufactured by it. In summary, only if Quikduc commenced business in the production and sale of the cleat while Adams was employed by Lockformer and the machine and cleat would have been in competition with a product produced and sold by Lockformer or if the Quikduc/Flagler partnership was formed and commenced business would Adams have been required, "as a matter of law," to give up his interest in the cleat and the related venture. Accordingly, at the time Adams agreed to give up his Quikduc interest in exchange for the three-year employment contract, he was not required to do so since neither of the foregoing circumstances existed. That Adams did give up his interest constituted a detriment to him and, thus, was sufficient consideration in exchange for Lockformer's promise of the three-year employment contract.

Lockformer's final contention on this issue is that Adams' relin-

quishment of his Quikduc interest did not constitute adequate consideration because that interest was worthless, *i.e.*, "no *** deal was either negotiated or on the table" as of the time of the group's meeting with Link on January 4, 1982, and, thus, there was no interest for Adams to give up.

■■ Normally, the question of the adequacy of consideration is not for the courts to inquire into. (*Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 356 N.E.2d 67.) Upon inquiry, however, its adequacy is to be determined as of the time of entering into the contract. (*O'Neill v. De Laney* (1980), 92 Ill. App. 3d 292, 415 N.E.2d 1260.) It is well settled that a jury's verdict will only be reversed where the evidence, when viewed in the light most favorable to a plaintiff, so overwhelmingly favors the defendant that no contrary verdict could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) If there is evidence which supports a jury's verdict, a reviewing court will not disturb that verdict. *Zizzo v. Ben Pekin Corp.* (1979), 79 Ill. App. 3d 386, 398 N.E.2d 382.

■ In the instant case, the testimony of the witnesses was conflicting concerning the viability of the Quikduc venture at the time of entry into the oral employment contract between the parties; Lockformer contended the "deals" were "dead," and Adams contended they were "close" to being consummated and "on target." Accordingly, it was necessary for the trier of fact to evaluate the credibility of the witnesses and to weigh the evidence in making a determination on this issue. (*B. F. Gump Co. v. Industrial Comm'n* (1952), 411 Ill. 196, 103 N.E.2d 504.) Based upon the facts that Adams testified that he was told by Gale and believed that the group's "deal" with Flagler was "close," that the negotiations with Vlastnik and Daw were "on target," that Vlastnik and Daw proceeded with the venture for years until a sale was made to a major competitor shortly before trial, and that Lockformer itself subsequently, and profitably, produced a similar cleat, we cannot say that the jury's apparent finding, that Adams' relinquishment of his interest in the Quikduc venture was not "worthless" and, instead, constituted adequate consideration, was overwhelmingly against the manifest weight of the evidence.

In light of the foregoing, we hold that Adams' relinquishment of his Quikduc interest constituted sufficient consideration for Lockformer's contract of employment and that the trial court did not err in denying Lockformer's motions for a directed verdict or judgment notwithstanding the verdict.

## II

■ Lockformer next contends that even assuming the contract was supported by adequate consideration, the contract falls squarely within the doctrine of the Statute of Frauds because it was an agreement that was incapable of being performed within one year. Lockformer further argues that "[i]n no way can Plaintiff's relinquishment of any rights in the Quikduc concept be said to constitute *full* performance [which would bar application of the Statute of Frauds] for the simple reason that the alleged contract clearly contemplated either expressly or implicitly that Plaintiff would also continue to work for Defendant for three years." (Emphasis in original.) We disagree.

The Statute of Frauds (Ill. Rev. Stat. 1985, ch. 59, par. 1) provides that "no action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith." However, it is also well settled that complete performance on one side of an oral agreement bars application of the statute. *McIntosh v. Magna Systems, Inc.* (N.D. Ill. 1982), 539 F. Supp. 1185 (although agreement between parties envisioned a three-year term during which the defendant would reserve an annual fee on the plaintiff's behalf or the plaintiff could exercise an option to purchase a percentage of the defendant's stock in lieu thereof, the Statute of Frauds could not be invoked as a defense where the plaintiff, who was to assist the defendant in the development, acquisition, marketing, production and distribution of the defendant's educational materials to colleges, alleged full performance of his obligations within one year).

In the instant case, we believe, contrary to Lockformer's argument, that Adams' divestiture of his Quikduc interest was the only obligation under the agreement which he promised to perform, and performance of the promise barred Lockformer's defense based on the Statute of Frauds. Specifically, it was Lockformer who promised to give Adams a three-year employment contract in exchange for his promise to relinquish his interest in Quikduc. Adams did not promise, as Lockformer contends, that he would work for Lockformer for three years and, thus, he was not obligated to do so. In other words, although Adams admits he requested a three-year employment contract for security reasons, the bargain between the parties consisted simply of Lockformer's promise to give him the contract in exchange for Adams' sole, "expressed" promise to divest himself of his Quikduc interest. Additionally, Lockformer's further distinction that by the

contract Adams "implicitly" agreed to continue to work for it for three years amounts to a bare assertion—no explanation, argument, or citation to authority is made in support of this proposition. Instead of Lockformer's interpretation of the contract that Adams was promising, as a result of his request for a contract, to work for it for three years, we believe it is just as reasonable to assume that his request was merely made for the purpose of security, as he testified, in order to obtain vestment in the company pension plan and to allow himself time to examine other options. In summary, clearly Adams only promised to divest himself of his Quikduc interest in exchange for a three-year contract of employment; he did not promise to divest himself of the interest *and* promise to work for Lockformer for three years. He fully performed his promise/obligation under the agreement within less than one year in divesting himself of his interest in Quikduc, and, therefore, the Statute of Frauds was inapplicable as a defense to the contract.

### III

■ Lockformer further argues that the trial court erred in granting Adams' motion for a directed verdict on its counterclaim against him for breach of his fiduciary duties. It is well settled that a verdict ought not to be directed unless all the evidence, when viewed in the light most favorable to the proponent, so overwhelmingly favors the moving party that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Here, Lockformer asserts the following bases in support of its contention that Adams breached his fiduciary duties: while employed by Lockformer as an officer, Adams was attempting to negotiate a deal with the Flagler Corporation, a direct competitor of Lockformer, to produce a machine that could easily have been produced by Lockformer as could the Quikduc device; that Adams was soliciting business for Flagler; and that Adams was supervising Heilman at the time Heilman told him about the Quikduc device and, the device being within the scope of Heilman's invention agreement with Lockformer, Adams was required to tell Heilman to reveal the idea to Lockformer or to do so himself. Lockformer also contends, for the first time in its reply brief, that "there was evidence that Plaintiff did go beyond the 'preliminary planning stages' " in pursuit of the Quikduc venture. Accordingly, Lockformer argues that this evidence was sufficient to submit the issue to the jury and the trial court's failure to do so was error.

We first observe that Lockformer's argument that Adams went

beyond "preliminary planning stages" in his participation in the Quikduc venture is a bare assertion; Lockformer offers no explanation of this statement and, thus, makes no argument or citation to authority. On the other hand, we believe our discussion in point I, above, concerning Adams' alleged duty as a fiduciary to give up his Quikduc interest is dispositive of this contention, as well as Lockformer's additional contentions with respect to the negotiations with Flagler and Adams' "failure" to inform Lockformer of the Quikduc idea/venture. As we stated there, even though an employee of Lockformer, Adams could legitimately go so far as to form a rival corporation and outfit it for business as long as he did not commence business while employed by Lockformer. No evidence was presented that Quikduc in fact commenced business.

Secondly, negotiating with Flagler for production of a machine to produce the cleat was not in competition with Lockformer, since Lockformer did not make such a machine and, in fact, did not produce the cleat the parties contemplated producing; it simply was not in the business of selling duct connectors. Compare *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398 (officer breached his fiduciary duty where he contributed substantial financial support to the development of a superior vending machine that would be competitive with an older model produced by his employer).

We also find as irrelevant the fact that Lockformer *could have produced* the machine and the cleat, and subsequently did so, because at the time in question it had not done so and had never evidenced an interest in changing its "line" of products to include such a product as the cleat. In fact, Link repeatedly rejected the Quikduc product when it was subsequently offered to him by Vlastnik and Heilman and, when Gale told him about it, he stated neither he nor Lockformer was interested in it. With respect to Adams' alleged fiduciary breach to inform Lockformer of Heilman's idea, we note that it was *only an idea*, not a concrete invention which could be submitted to Lockformer at the time in question and, moreover, as stated above, the Quikduc device or machine to produce it were not products produced by Lockformer.

We similarly reject Lockformer's final argument that Adams was soliciting business for Flagler. Lockformer relies on the following testimony of Adams in support of this contention:

"Q. While you're an officer of the Lockformer Corporation, you're participating in getting industry for the Flagler Corporation?

A. Right. Leo, Bob and I, no question, all three of us were."

The meaning of this statement is unclear since it was not further developed by Lockformer's counsel or explained by Adams. However, according to Heilman's testimony, the statement appears to have concerned a drawing which Flagler gave to him at some unspecified time and place and Heilman "gave [Flagler] the information required to *quote*." (Emphasis added.) Adams, who had no knowledge of how to make a "quote," apparently put the quote in the mail at Heilman's request. Under these facts, we do not believe that this action by Adams constituted "soliciting business for Flagler." In light of the foregoing, therefore, we find no evidence of a breach of fiduciary duties by Adams and, accordingly, hold that the trial court did not err in directing a verdict for Adams on Lockformer's counterclaim.

Lockformer's additional argument on this issue concerns damages for Adams' alleged breach of his fiduciary duties. Since we have determined that there was no breach by Adams, we do not address this argument.

## IV

■ Lockformer's final argument is that the trial court erred in permitting testimony as to the witnesses' understanding of the alleged contract. It is based on the disputed evidence of what was said concerning what the January 4, 1982, contract entailed. Lockformer contends that the testimony of the witnesses on this issue consisted of opinions or beliefs as opposed to what Link actually said. The argument is unclear and, in any event, Lockformer did not raise this issue in its post-trial motions and it is thus waived. See *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337.

For the foregoing reasons, the orders appealed from are affirmed.

Affirmed.

LORENZ, P.J., and SULLIVAN, J., concur.