PRODUCTION CREDIT ASSOCIATION
OF MANDAN, a Corporation,
Plaintiff and Appellee

v.

Duane RUB, Defendant and Appellant

and

Marlys Rub, Jeffrey Rub, Jana Rub,
and John Magstadt, Defendants

PRODUCTION CREDIT ASSOCIATION
OF MANDAN, a Corporation,
Plaintiff and Appellee

v.

Duane RUB and Jeffrey Rub,
Defendants and
Appellants

and

Marlys Rub, Jana Rub, and John
Magstadt, Defendants

PRODUCTION CREDIT ASSOCIATION
OF MANDAN, a Corporation,
Plaintiff and Appellee

v.

Duane RUB, Marlys Rub, Jana Rub,
and John Magstadt, Defendants

and

Jeffrey Rub, Defendant and Appellant

Civ. Nos. 900408, 900419, 910015,
910042 and 910070.

Supreme Court of North Dakota.

Sept. 11, 1991.

Thomas B. Bair, of Bair, Brown & Kautzmann, Mandan, for plaintiff and appellee.

Duane Rub, pro se.

Jeffrey Rub, pro se.

VANDEWALLE, Justice.

Duane Rub and Jeffrey Rub appealed from a judgment, an order dismissing their counterclaims, and an amended judgment, all entered in an action by Production Credit Association of Mandan [PCA] to recover money loaned to Duane and Marlys Rub [the Rubs] and to foreclose a security interest in the Rubs's livestock and equipment. Duane also appealed from an order denying his demand for a change of judge. We affirm.

This case began with PCA and Duane establishing a lending relationship in 1969. As security for loans with PCA, the Rubs and PCA executed a farm security agreement on April 1, 1976, granting PCA a security interest in farm equipment, livestock, farm supplies, and livestock feed and grain. PCA filed a financing statement listing that collateral. PCA filed two continuation statements for the original financing statement on March 13, 1981, and February 25, 1986. On May 4, 1982, and April 19, 1983, PCA and Duane and Marlys executed amended security agreements granting PCA a security interest in specific crops as well as equipment, livestock, and accounts. Subsequent facts reveal the long and desperate attempt by the Rubs to preserve the family farm and ranch operation through legal maneuvers in which, as here, they sometimes represented themselves.

The principal issue in this case involves the extent of PCA's interest in the Rubs's farm equipment and livestock vis-a-vis a competing claim by Jeffrey and Jana Rub. Jeffrey and Jana's claim arises from a security agreement, dated April 1, 1984, with Duane and Marlys in which Duane and Marlys purportedly granted Jeffrey and Jana a security interest in that collateral.

On April 13, 1984, Duane petitioned for reorganization under Chapter 11 of the Bankruptcy Code.[1] That petition was dismissed effective March 14, 1986. On April 28, 1986, PCA commenced this action against Duane and Marlys to recover the balance due on its loan with them and to foreclose on the collateral securing the loan. Duane and Marlys answered, generally denying that they owed PCA the money and raising several defenses, including a claim that PCA's security interest violated Section 35–05–04, N.D.C.C. The Rubs also counterclaimed for rescission and for damages for breach of contract.

On May 21, 1987, the district court, the Honorable William F. Hodny, granted PCA partial summary judgment, concluding that under Section 35–05–04, N.D.C.C., PCA's security interest in the crops was invalid but that PCA's security interest in the other property described in the security agreement was valid as between PCA and the Rubs.

On August 15, 1988, Duane again filed for relief under Chapter 11 of the Bankruptcy Code and the issue about Section 35–05–04, N.D.C.C., was subsequently presented to the bankruptcy court in an adversary proceeding. The bankruptcy court, the Honorable William A. Hill, determined that PCA's security interest in the 1982 and 1983 crops was void because those security agreements claimed a security interest in both crops and other personal property in violation of Section 35–05–04 N.D.C.C. However, Judge Hill determined that PCA had a valid lien on Duane's farm equipment, livestock, livestock feed, and farm supplies because the 1976 security agreement had not been terminated by the 1982 and 1983 security agreements.

1. 11 U.S.C.A. § 1101 et seq. That chapter generally provides procedures for debtor reorganization.

On appeal, the federal district court, the Honorable Patrick A. Conmy, relied on *In re Norby*, 96 B.R. 988 (D.N.D.1988), and concluded that the 1976 security agreement had been terminated by the 1982 and 1983 security agreements. Judge Conmy concluded that the 1983 security agreement violated Section 35–05–04, N.D.C.C., and that PCA did not have a security interest in Duane's crops. Judge Conmy concluded that PCA had an "unsecured security interest" in the other personal property listed in the 1983 security agreement. In an attempt to appeal that decision, PCA sought a Rule 54(b), F.R.Civ.P. certification but Judge Conmy denied the motion for certification. On August 25, 1989, Duane's petition for relief under Chapter 11 of the bankruptcy code was dismissed by the bankruptcy court.

Because Jeffrey and Jana claimed an interest in the same collateral, PCA then amended its complaint to name them as defendants.[2] Jeffrey and Jana answered, raising the same defenses and counterclaims as Duane and Marlys. The district court, the Honorable Benny Graff, bifurcated the Rubs's counterclaims and heard the equitable issues in a bench trial on October 17, 1990. Judge Graff determined that PCA's claimed security interest in the crops was invalid but that its security interest in the equipment and cattle was valid between Duane and PCA. Contrary to the decision by Judge Conmy, Judge Graff found that PCA never released its 1976 lien on the equipment or cattle. Judge Graff also found that Jeffrey did not have a security interest on any of Duane's property because the UCC statements documenting that interest were fraudulent and no consideration existed to support it. Judge

Graff granted PCA judgment against Duane and Marlys for $312,414.06, plus interest, and ordered foreclosure of PCA's lien on the secured property. That judgment did not specifically dispose of the Rubs's counterclaims.

Jeffrey and Duane both appealed from the judgment. PCA moved for an order temporarily remanding the case to the trial court for disposition of the counterclaims. On remand Judge Graff concluded that the counterclaims were intrinsically involved in the foreclosure action and dismissed them. An amended judgment was entered and Jeffrey and Duane appeal from the order dismissing the counterclaims and from the amended judgment.[3] After trial Duane Rub also filed a demand for change of judge against Judge Graff. That motion was denied, and Duane also filed a notice of appeal from that order.

■■■■ The Rubs raise several issues on appeal. However, the primary issue relates to PCA's interest in the collateral vis-a-vis Jeffrey and Jana. The Rubs argue that Jeffrey has a valid secured interest in the cattle and equipment which is superior to PCA's interest in the same collateral. PCA contends that Jeffrey does not have a valid enforceable security interest in the collateral because he did not give value.

Section 41–09–05(1)(*l*), N.D.C.C. [U.C.C. § 9–105(1)(*l*)], defines a security agreement as "an agreement which creates or provides for a security interest." Section 41–01–11(37), N.D.C.C. [U.C.C. § 1–201(37)], defines a security interest as "an interest in personal property or fixtures which secures payment or performance of an obligation." Section 41–09–16(1), N.D.C.C. [U.C.C. § 9–203(1)],[4] specifies

---

**2.** John Magstadt also claimed an interest in the collateral and was named a defendant in the action. However, he did not answer the complaint and defaulted.

**3.** Although the trial court ordinarily loses jurisdiction over a case once a notice of appeal has been filed [*Vorachek v. Citizens State Bank of Lankin*, 421 N.W.2d 45 (N.D.1988)], PCA moved for remand for disposition of the counterclaims because the Rubs's appeals were improper without a Rule 54(b), N.D.R.Civ.P., certification. E.g., *United Hospital v. D'Annunzio*, 462 N.W.2d

652 (N.D.1990). Judge Graff therefore had jurisdiction to rule on the counterclaims. Because the Rubs have appealed from the original judgment and the final amended judgment, any issues involved in appeals from interlocutory orders are now properly before us. *See Hall GMC, Inc. v. Crane Carrier Co.*, 332 N.W.2d 54 (N.D.1983); *Suburban Sales & Service, Inc. v. District Court of Ramsey County*, 290 N.W.2d 247 (N.D.1980).

**4.** Section 41–09–16(1), N.D.C.C., provides:

that "value" must be given in order to create an enforceable security interest. Section 41–01–11(44), N.D.C.C. [U.C.C. § 1–201(44) ], provides that a person gives "value" for rights if that person acquires those rights in return for any consideration sufficient to support a simple contract.

The Rubs argue that part of the consideration for the security agreement was farm work done by Jeffrey as well as love and affection. However, it is generally recognized that love and affection are insufficient legal consideration to support an executory contract. *Town of Middlebury v. Steinmann,* 189 Conn. 710, 458 A.2d 393 (1983); *O'Neill v. Delaney,* 92 Ill.App.3d 292, 47 Ill.Dec. 947, 415 N.E.2d 1260 (1980); *Hoffmann v. Wausau Concrete Co.,* 58 Wis.2d 472, 207 N.W.2d 80 (1973); see 17 Am.Jur.2d, Contracts § 131 (1991).

Additionally, although Sections 9–05–10 and 31–11–03(21), N.D.C.C., provide that a written instrument is presumptive evidence of consideration, Judge Graff stated from the bench:

"I do know this, both Mr. Rub's, that I think the transaction between you two is completely fraudulent. I think it's a hoax upon the Court. I don't think there is any underlying consideration. I abso-

lutely think both of you lied when you took the witness stand today and I do not believe that you have any perfected security interest whatsoever in any of this property, Jeffrey, I do know now."

Judge Graff's memorandum opinion provided:

"This Court specifically finds that Jeffrey does not have a lien on any of the property of Duane and the UCC statements and security agreements filed are fraudulent as they pertain to the PCA and the general public. In this Court's opinion there has never been any exchange of money or services for such agreements, and the same are not entitled to any legal effect."

Duane and Marlys signed a "security agreement" granting Jeffrey and Jana a "security interest" in the collateral on April 1, 1984; however, they were not listed as creditors in Duane's first bankruptcy petition filed on April 13, 1984. Although Duane and Marlys signed a promissory note, dated January 1, 1988, promising to pay Jeffrey and Jana $139,747.48, the Rubs were evasive about the consideration given by Jeffrey for the note and security agreement.[5] The Rubs's documentation of the

---

"... a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless all of the following take place:

"a. The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement that contains a description of the collateral and, in addition, if the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned.

"b. Value has been given.

"c. The debtor has rights in the collateral."

The Rubs also contend a promissory note is necessary to create a security interest and there was no promissory note between the Rubs and PCA. Section 41–09–16, N.D.C.C., identifies the requirements for an enforceable security agreement and does not require a promissory note. The Uniform Commercial Code requires " ' "no magic words or precise form" ' " to establish a security interest. *Elhard v. Prairie Distributors, Inc.,* 366 N.W.2d 465, 468 (N.D.1985) *citing* J. White & R. Summers, Uniform Commercial Code § 23–3 (2d ed. 1980).

**5.** At trial Duane testified about the consideration for the security agreement:

"Q. You didn't answer my question. Why did you give Jeffrey a security interest in your livestock two weeks before you filed bankruptcy?

"A. I don't recall.

"Q. Did he loan you some money?

"A. According to whatever the promissory note—

"Q. Answer my question. Did he loan you money? Did he give you some money and in exchange you gave him a note and this security interest?

"A. The note is the evidence of the debt.

"Q. Mr. Rub, answer the question.

"A. There was various ways that he had done this.

"Q. Mr. Rub, would you answer the question?

"THE COURT: He asked you: Did Jeffrey give you some money?

"THE WITNESS: Monies in what?

"THE COURT: Dollars. Cash. Currency.

"THE WITNESS: I don't recall cash currency. The note is an establishment of the debt.

"THE COURT: I don't want your legal conclusion. I want you to answer the question.

lien also indicates serious discrepancies about the amount Duane owed to Jeffrey. Under these circumstances, we conclude that the trial court's finding that the Rubs fraudulently filed UCC statements and security agreements is not clearly erroneous under Rule 52(a), N.D.R.Civ.P. We therefore agree with the trial court that there was no consideration to support the security agreement.

■ The Rubs nevertheless contend that PCA had no security interest in the property because the 1982 and 1983 security agreements were invalid as a result of Section 35-05-04, N.D.C.C., which, when the agreements were executed, provided:

"*35-05-04. Security agreement not to include other personal property.* A security agreement covering specific crops is not valid to create a security interest therein, nor entitled to be filed in the office of the register of deeds, if the security agreement contains any provi-

sion by which a security interest is claimed in any other personal property."

In *In re Norby*, 96 B.R. 988, 990 (D.N.D.1988), *affirmed* 873 F.2d 1445 (8th Cir.1989), the Federal District Court for North Dakota considered the validity of a 1986 security agreement which attempted to grant a security interest in crops and also in other personal property:

"The first clause of section 35-05-04 reads 'a security agreement covering specific crops is not valid to create a security interest therein'. Consequently, the security agreement relating to specific crops cannot create a security interest in the crops where there is also a claim in other personal property. Section 35-05-04, however, does not invalidate the security agreement as to the debtor's other personal property. It only invalidates the secured interest in the specific crops where, as here, the agreement attempts to claim an interest in other personal property in addition to an interest in the

---

"THE WITNESS: I don't recall.

\* \* \* \* \* \*

"Q. And it's also true, isn't it, Duane, that you did not disclose in your first bankruptcy proceeding that you owed Jeff any money, did you?

"A. I don't recall that.

"Q. Well, he wasn't listed as a creditor on your schedules, was he?

"A. Never. Ever?

"Q. In your first bankruptcy, was he?

"A. I don't recall if he was or wasn't?

"Q. Was this some secret little deal you and Jeff cooked up?

"A. No.

"Q. Why didn't you show him as a creditor then?

"A. I don't recall why he wouldn't have been shown a creditor.

\* \* \* \* \* \*

"Q. All right, right, and would that be the extent of what you gave him as security interest in livestock for that pre Aril [sic] 1st, 1984 debt?

"A. Well, there was various other things than that. I just don't recall what they were.

"Q. How did you arrive at an amount on this promissory note? Did you just pull a figure out of the air?

"A. No, it was services that were rendered and stuff like that—various reasons."

Jeffrey also testified about the consideration for the security agreement:

"Q. Was there a promissory note signed on April 1, 1984, by Duane to you and your wife?

"A. Yah, not for an equal amount as this.

"Q. How much was it?

"A. I don't recall if it—

"Q. Approximately? Fifty thousand, two hundred thousand, a hundred thousand?

"A. I can't say. I honestly don't know.

"Q. Well, we know that with reference to Exhibit 22A, the One hundred thirty-nine thousand some odd hundred dollar note, there have been no payments made on that since January 5th of '88 from April 1st of 1984 until January 5th, 1988. Did you loan any more money to Duane?

"A. There was various things that went into it. There was things such as labor. There were such things as materials and that went into the operation—different other things.

"Q. So you were rendering services to him and he was giving you notes in exchange, rather than giving you money, is that a fair statement?

"A. There may have been some money too that was exchanged, but that certainly was part of it.

"Q. From April 1st, 1984, to January 1st, 1988, did Duane make any payments to you on these various obligations—the notes?

"A. No.

"Q. So he has never made a payment on any of the notes?

"A. I don't believe so."

specific crops. The remaining clause in section 35–05–04 does provide, however, that such a security agreement is not entitled to be filed in the Register of Deeds. It is this portion of the statute that invalidates the perfected security interest in the other personal property. By the clear language of the statute, since the security agreement was not entitled to be filed, the creditor cannot now claim a perfected security interest in the other personal property.

"It is therefore the holding of the court that the 1986 security agreement is in violation of section 35–05–04 since it claims an interest in specific crops and other personal property. Further, based on the foregoing analysis of section 35–05–04 the security agreement is invalid as it relates to the specific crops, but valid as to the other personal property. Accordingly, the bank does not have a secured interest in the debtors crops, but is left with an unperfected security interest in the other personal property listed on the 1986 security agreement."

Judge Graff employed that rationale when he said that although the security interest in the crops was invalid, "the security interest in the other personal property continues to be valid between Duane and the PCA." We agree with that interpretation of Section 35–05–04, N.D.C.C., and hold that although PCA does not have a security interest in the crops mentioned in the 1982 and 1983 security agreements, it does have an unperfected security interest in the other collateral vis-a-vis Duane. *In re Norby, supra.*[6] *Compare Production*

*Credit Ass'n of Fargo v. Foss,* 391 N.W.2d 622 (N.D.1986) [Section 35–05–04, N.D.C.C., not applicable to security interest in debtor's right to receive sugar beet contract payments]. The security agreement is therefore valid against Duane as to that collateral and because Jeffrey and Jana did not have a valid security interest in that collateral, the trial court did not err in granting PCA a foreclosure judgment on that collateral.[7]

 The Rubs also contend that they were denied their right to a trial by jury.

Judge Graff initially ordered that the equitable issues in the foreclosure action would be tried to the court and that "[i]ssues remaining untried requiring a jury" would be tried later. On temporary remand from this court, Judge Graff determined that any remaining issues on the counterclaims were "intrinsically" involved in the foreclosure action and dismissed the Rubs's counterclaims.

The right to a jury trial depends upon whether a case is an action at law or an action in equity. *First National Bank and Trust v. Brakken,* 468 N.W.2d 633 (N.D.1991). There is no absolute right to a jury trial in an equitable action. *Id.* Although a claim for money damages traditionally constitutes a claim for legal relief triable to a jury, the parties are not entitled to a jury trial if the damage claim is incidental to and dependent upon a primary claim for which a jury trial is not allowed. *Id.; Adolph Rub Trust v. Rub,* 474 N.W.2d 73 (N.D.1991). The foreclosure of a lien is an equitable action triable to the court

---

6. We note that both Judge Hill and Judge Hodny essentially reached the same conclusion regarding the other personal property. After entry of the judgment in this case, the Rubs sought to remove the case to federal district court. Judge Conmy denied their request and also "noted that the rulings of Judge Graff and of this court may not, in fact, be in conflict."

7. Because of our resolution of this issue we need not decide whether Judge Conmy's decision about whether the 1976 security agreement was terminated was res judicata. However, we observe that under 11 U.S.C.S. § 349(b), the dismissal of a bankruptcy petition generally reinstates any transfer avoided under 11 U.S.C.S. § 544 and any lien avoided under 11 U.S.C.S.

§ 506(d). Section 349(b) reflects the general rule that, to the extent possible, a dismissal of a bankruptcy petition reverses what has transpired in the bankruptcy. The legislative history for that section reflects a basic purpose to undo the bankruptcy case, as far as practicable, and to restore all property rights to their position as of the filing of the bankruptcy. *United States v. Standard State Bank,* 91 B.R. 874 (W.D.Mo.1988); *In re Newton,* 64 B.R. 790 (Bkrtcy.C.D.Ill.1986). In this case, Duane's Chapter 11 bankruptcy petition was dismissed by the bankruptcy court without confirmation of a discharge plan and without an order preserving Judge Conmy's decision.

**538**

without a jury. *Union State Bank v. Miller,* 335 N.W.2d 807 (N.D.), *cert. denied,* 464 U.S. 1019, 104 S.Ct. 554, 78 L.Ed.2d 727 (1983).

In this case the Rubs's counterclaims were incidental to and dependent upon a primary claim for which they were not entitled to a jury trial. *Brakken, supra.* We therefore agree with the trial court that the issues in the "counterclaims" were intrinsically involved with the foreclosure action. The trial court did not err in dismissing the Rubs's counterclaims.

The Rubs argue that the State court did not have jurisdiction over PCA because it was not registered with the secretary of state as a North Dakota corporation or as a foreign corporation. That argument was rejected in *PCA v. Obrigewitch,* 462 N.W.2d 115 (N.D.1990).

The Rubs also contend that Judge Graff was biased and prejudiced against them and that the request for change of judge should have been granted. The demand for change of judge was not timely under Section 29-15-21, N.D.C.C., and the Rubs's bald assertions of bias and prejudice are meritless. *Adolph Rub Trust v. Rub,* 474 N.W.2d 33 (N.D.1991); *Adolph Rub Trust v. Rub,* 473 N.W.2d 442 (N.D.1991).

The district court judgments and orders are affirmed.

ERICKSTAD, C.J., LEVINE, and MESCHKE, JJ., and EVERETT NELS OLSON, District Judge, concur.

EVERETT NELS OLSON, District Judge, sitting in place of GIERKE, J., disqualified.