Steven S. SCHOLES, not individually but solely as Receiver for Michael S. Douglas, D & S Trading Group, Ltd., Analytic Trading Systems, Inc., Analytic Trading Service, Inc., and Market Systems, Inc., Plaintiff,

v.

AFRICAN ENTERPRISE, INC., Bethany Evangelical Free Church, Heart Cry International, Hindustan Bible Institute, Inc., International Students, Inc., Proclamation International, Inc., and World Vision, Inc., Defendants.

No. 90 C 3989.

United States District Court,
N.D. Illinois,
Eastern Division.

June 21, 1994.

Wilber H. Boies, Gary L. Prior, Richard Lawton Sandler, Jane M. Simon, Michael V. Hughes, Mary B. Tribby, Mark Thomas Ostrowski, McDermott, Will & Emery, Ruta K. Stropus, Sachnoff & Weaver, Ltd., Chicago, IL, for Steven S. Scholes.

Catherine Patricia Wassberg, Jenner & Block, Timothy C. Klenk, Jerome Kiley Bowman, Ross & Hardies, P.C., Chicago, IL, for African Enterprise, Inc., Bethany Evangelical Free Church, Food for the Hungry, Inc., Hindustan Bible Institute, Inc., International Students, Inc., Proclamation Intern., Inc., Trinity College, Trinity Evangelical Divinity School.

Robert Ronald Tepper, Law Offices of Robert R. Tepper, Chicago, IL, for Camp Elim and Other Youth Ministries of Haiti.

Paul B. Newman, Newaygo, MI, for Gospel Revival Ministries.

Scott H. Kenig, Holleb & Coff, Chicago, IL, for Heart Cry Intern.

C. William Bockelman, Jr., O'Neill & Bockelman, P.C., Lake Forest, IL, Scott H. Kenig, Holleb & Coff, Chicago, IL, for Lake Forest Academy, Calvary Chapel of Chula Vista.

Timothy C. Klenk, Jerome Kiley Bowman, Ross & Hardies, P.C., Chicago, IL, for World Vision, Inc.

James A. Davids, Bruce J. Van Heukelem, Hoogendoorn, Talbot, Davids, Godfrey & Milligan, Chicago, IL, H. Robert Showers, Peter Rathbun, Gammon & Grange, P.C., McLean, VA, for Camp Forest Springs.

### MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This case arises out of a fraudulent investment scheme perpetrated by Michael S. Douglas ("Douglas") from August 1987 to November 1989. At issue are monetary conveyances made by Douglas, during the pendency of the fraudulent investment scheme, to the defendants, all of which are non-profit corporations. Plaintiff Steven S. Scholes, as Receiver for the defunct investment entities, named sixteen defendants in his First Amended Complaint. Many defendants have settled the claims. Summary Judgment motions are pending against and on behalf of the following seven remaining defendants: (1) Bethany Evangelical Free Church ("Bethany"), (2) World Vision, Inc. ("World Vision"), (3) Proclamation International, Inc. ("Proclamation"), (4) International Students, Inc. ("International Students"), (5) Hindustan Bible Institute, Inc. ("Hindustan"), (6) African Enterprise, Inc. ("African Enterprise") and (7) Heart Cry International ("Heart Cry"). Scholes asserts claims for fraudulent conveyance and unjust enrichment against each.

Presently before the court are (1) the Receiver's Motion for Summary Judgment Against Hindustan Bible Institute, Inc., International Students, Inc., and Proclamation International, Inc., (2) the Receiver's Motion for Summary Judgment Against African Enterprise, Inc. and Bethany Evangelical Free Church, (3) the Receiver's Motion for Summary Judgment Against Heart Cry International and World Vision, Inc., (4) Motion of Certain Defendants [namely African Enterprise, Hindustan, International Students, and World Vision] for Summary Judgment, and (5) Motion for Summary Judgment of Proclamation International, Inc. and Bethany Evangelical Free Church.

### I. FACTS

From August 1987 until November 13, 1989, Douglas and others perpetrated a massive securities fraud, for which Douglas was indicted on June 19, 1990. (certified copy of Indictment (hereinafter "Indictment"), Exhibit A, Reply Mem. In Supp. of Receiver's Mot. for Summ. J. Against African Enterprise, Inc. and Bethany Evangelical Free Church (hereinafter "AE Reply Memo")) The Indictment charged Douglas with seven counts of mail fraud and one count of providing false information to the United States government. On January 11, 1991, Douglas was convicted, pursuant to a guilty plea, of three counts of mail fraud and one count of providing false information to the government, and was sentenced to 12 years in pris-

on. (AE Reply Memo, Exhibit B (certified copy of Judgment in a Criminal Case); Plea Agreement in *United States v. Michael S. Douglas,* case No. 90 CR 557 (N.D.Ill. October 4, 1990) (hereafter "Plea Agreement"))

Douglas operated the scam by purporting to sell limited partnership interests in three entities now in receivership: D & S Trading Group, Ltd. ("D & S"), Analytic Trading Systems, Inc. ("AT Systems") and Analytic Trading Service, Inc. ("AT Service"). (Pl.'s Stmt. of Material Facts as to Which There is No Genuine Issue with Respect to Hindustan Bible Institute, Inc., International Students, Inc., and Proclamation International, Inc. (hereafter "Pl.'s Hindustan 12(m) Stmt."), at ¶ 5) Douglas had effective control over each of these entities. (*Id.; see* Dep. Transcript of Douglas (hereafter "Douglas Dep."), pp. 364–65, attached as Exhibit F to the Statement of Material Facts as to which There Is No Genuine Issue With Respect to Heart Cry International, and World Vision, Inc. (hereinafter "Pl.'s Heart Cry 12(m) Stmt.")) Douglas misappropriated funds from these entities and provided public investors with false and misleading information concerning them. (Pl.'s Hindustan 12(m) Stmt., ¶ 6; Plea Agreement ¶ 5) Douglas funded the withdrawal of certain investors' capital and income with other investors' capital, in a classic Ponzi scheme. (*Id.*)

In January 1987, Douglas was released from incarceration after being convicted on charges relating to previous fraudulent activity. (Douglas Dep., pp. 24, 26–27) Prior to this time, Douglas had been in dire financial straits. (*See* certified copy of Affidavit of Assets and Liabilities of Michael Douglas, attached to AE Reply Memo as Exhibit C) At the time of his release in January 1987, Douglas, by his own admission, had a negative net worth. (Douglas Dep., pp. 39, 53) Douglas had unpaid judgments totalling $28,-166.06 outstanding against him upon his release. (*See* certified copy of Judgments attached to AE Reply Memo as Exhibit D) None of those judgments has been satisfied. (*See* Docket Sheets attached to AE Reply Memo as Exhibit E)

From the time he was released from incarceration in January 1987 until the formation of D & S in August 1987, Douglas held two jobs, one with Computerland and one with San Gregorio Partners. (Douglas Dep., pp. 53–55) During this period of time, Douglas earned $3,512.48 from Chicago Metropolitan Computers, Inc. and $6,548.00 from San Gregorio Partners. (*See* Pl.'s Heart Cry 12(m) Stmt., Exhibit I (1987 federal tax return of M.S. Douglas and J.T. Douglas, pp. 19–20)) Thus, at the time Douglas started D & S he had a negative net worth of at least $18,105.58—the total of the judgments outstanding against him at the time less his total gross compensation of $10,060.48 from the time he was released until he began D & S.

Douglas embezzled, converted and diverted investor funds from D & S, AT Systems and AT Service. (Pl.'s Hindustan 12(m) Stmt., at ¶ 10; *see also* Exhibit A, Affidavit of [the accountant retained by the Receiver,] Richard A. Mark (hereinafter "Mark Affidavit"), attached thereto, at ¶ 3; Plea Agreement ¶ 5) From August 1987 until November 13, 1989, the date the SEC shut Douglas down, Douglas had no source of income other than the money he took from D & S, AT Systems, AT Service and investors. (Douglas Dep., pp. 56–58; Mark Affidavit, ¶ 3) All of Douglas' "net worth" as of November 30, 1989, the date the Receiver was appointed, was attributable to monies Douglas diverted from D & S, AT Systems and AT Service. (Douglas Dep., pp. 57–58; Mark Affidavit, ¶ 3) According to the affidavit of Mr. Mark, the accountant retained by the Receiver, from August 1987 through November 1989 Douglas was insolvent both in the sense that his liabilities exceeded his assets and in the sense that he was unable to pay his debts as they came due. (Mark Affidavit, ¶ 3) Furthermore, according to the Receiver, Douglas failed to retain sufficient property to pay his creditors. (*See* Affidavit of Steven S. Scholes, attached as Exhibit B to Pl.'s Hindustan 12(m) Stmt. (hereinafter "Scholes Affidavit"), at ¶¶ 2, 3)

Douglas operated D & S, AT Systems and AT Service in sequence. (Pl.'s Hindustan 12(m) Stmt., at ¶ 11) D & S operated from August 1987 until October 1988. (*Id.;* Douglas Dep., pp. 52, 157–58, 165) D & S purported to be a limited partnership in which inter-

ests were sold to the public. (Douglas Dep., pp. 157–58; Plea Agreement ¶ 5) Douglas was held out to be a general partner of D & S. (Douglas Dep., p. 158; Plea Agreement ¶ 5) Numerous investors in D & S executed limited partnership agreements titled "Articles of Limited Partnership Establishing D & S Trading Group, Ltd." (Pl.'s Heart Cry 12(m) Stmt., Exhibit K, at ¶ 2) D & S, however, was never in fact formed as a limited partnership. (*See* Pl.'s Heart Cry 12(m) Stmt., Exhibit L)

Douglas knew in August 1987 that D & S was not properly registered with regulatory authorities. (Douglas Dep., pp. 270–71; Plea Agreement ¶ 5) From the inception of D & S, Douglas misappropriated monies from D & S and used them for his personal purposes, but he did not replace the funds and he did not disclose the diversions to investors. (Douglas Dep., pp. 193–99; Mark Affidavit, ¶ 3; Plea Agreement ¶ 5) Douglas knew these diversions were illegal. (Douglas Dep., pp. 199–200)

AT Systems began operations in approximately September 1988, simultaneous with the closing of D & S. (Mark Affidavit, ¶¶ 4, 5) Douglas was an officer, sole shareholder of, and person with control over, AT Systems. (Douglas Dep., pp. 249–50) Substantially all the funds invested in D & S were reinvested in AT Systems. (Douglas Dep., pp. 316–17) AT Systems purportedly was the corporate managing general partner of a limited partnership, in which interests were sold to the public. (Douglas Dep., p. 257) Numerous investors in AT Systems executed limited partnership agreements titled "ATS Fund I Limited Partnership." (Pl.'s Heart Cry 12(m) Stmt., Exhibit K, at ¶ 3) However, no such limited partnership was in fact ever formed. (*See Id.*, Exhibit M, at ¶ 3) AT Systems operated until approximately September 1989, when AT Service began operations. (Douglas Dep., p. 267) Douglas closed AT Systems out of fear that the SEC was going to shut down AT Systems because the interests it was selling were not properly registered. (Douglas Dep., pp. 268–71)

Douglas knew from the inception of AT Systems that the securities AT Systems was selling were required to be registered.

(Douglas Dep., p. 271) As he did with D & S, Douglas diverted AT Systems money to his own use from the inception of AT Systems (Douglas Dep., pp. 290–91, 322, 380–81; Mark Affidavit, ¶ 3), despite the fact that he knew the diversions were illegal. (Douglas Dep., p. 317) Approximately $4.1 million of the funds initially raised through AT Systems was transferred to D & S to fund the close-out of all D & S accounts. (Plea Agreement ¶ 5)

AT Service began operations in approximately September 1989. (Mark Affidavit, ¶ 6) Douglas had the same control and authority over AT Service that he had with respect to AT Systems. (Douglas Dep., pp. 364–65) Douglas was aware that the SEC was investigating AT Systems (Douglas Dep., p. 340), and Douglas desired to funnel former D & S and AT Systems investors and capital into an entity that was unknown to the SEC and with which he would not be connected as an officer, director, employee, or shareholder. (Douglas Dep., pp. 316–17, 326–27, 340, 343) Substantially all the funds invested in AT Systems were reinvested in AT Service. (Douglas Dep., p. 343) AT Service purportedly was the corporate managing general partner of a limited partnership, in which interests were sold to the public. (Douglas Dep., pp. 341–43) Numerous investors in AT Service executed limited partnership agreements titled "ATS Arbitrage Fund I Securities Trading Partnership," and "ATS Discretionary Fund II Securities Trading Partnership." (Pl.'s Heart Cry 12(m) Stmt., Exhibit K, ¶¶ 4 and 5) However, no such limited partnerships were in fact ever formed. (*See Id.*, Exhibit N) AT Service operated until November 13, 1989, when the SEC shut it down. (Douglas Dep., p. 366)

Douglas knew during all relevant times that AT Service was not properly registered with regulatory authorities. (Douglas Dep., pp. 270–71; Plea Agreement ¶ 5) Douglas misappropriated monies from AT Service and used them for his personal purposes. (Mark Affidavit, ¶ 3) During the time Douglas was conducting this fraud, he diverted in excess of $1.5 million which he contributed to several charities in his own name, as follows.

### HINDUSTAN BIBLE INSTITUTE, INC.

Hindustan is a California non-profit corporation with its principal place of business in Union Hills, North Carolina. (*See* Pl.'s Hindustan 12(m) Stmt., Exhibit D (Affidavit of Paul R. Gupta, ¶¶ 3, 4)) Douglas made the following charitable contributions to Hindustan on the respectively indicated dates:

| Date | Dollar Amount |
| --- | --- |
| April 19, 1988 | 1,000.00 |
| May 10, 1988 | 50.00 |
| August 4, 1988 | 300.00 |
| September 21, 1988 | 21.00 |
| September 26, 1988 | 100.00 |
| October 27, 1988 | 100.00 |
| December 15, 1988 | 100.00 |
| January 17, 1989 | 100.00 |
| February 1, 1989 | 100.00 |
| March 7, 1989 | 100.00 |
| March 14, 1989 | 5,000.00 |
| March 14, 1989 | 10,000.00 |
| March 31, 1989 | 100.00 |
| April 21, 1989 | 100.00 |
| May 11, 1989 | 100.00 |
| May 25, 1989 | 100.00 |
| June 5, 1989 | 50,000.00 |
| June 30, 1989 | 100.00 |
| July 13, 1989 | 5,257.79 |
| August 18, 1989 | 100.00 |
| September 28, 1989 | 100.00 |
| October 25, 1989 | 2,060.46 |
| Total: | $74,989.25 |

(*See* Pl.'s Hindustan 12(m) Stmt., Exhibit C) Hindustan deposited the monies it received from Douglas into Hindustan's account at Bank of America, account no. 2111–1930. (Pl.'s Heart Cry 12(m) Stmt., Exhibit Q; Pl.'s Hindustan 12(m) Stmt., Exhibit G) The monies transferred to Hindustan were monies Douglas obtained from D & S, AT Systems and AT Service. (Douglas Dep., pp. 1800–03) Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service (Douglas Dep., pp. 56–58), the funds transferred to Hindustan were monies originating from one or more of those entities.

In exchange for the transfers it received from Douglas, Hindustan provided no more than "an express or implied promise that his donation would be used for the tax-exempt purposes of [Hindustan] and, more specifically, for the purpose or purposes for which he designated his donations." (*See* Pl.'s Hindustan 12(m) Stmt., Exhibit H (Hindustan's Resp. to Int. No. 2, at pp. 5–6)) Hindustan provided no cash or other assets in exchange for the transfers. (Mark Affidavit, ¶ 7) Douglas claimed the transfers he made to Hindustan in 1988 as a deduction for charitable contributions on his 1988 federal income tax return. (*See* Pl.'s Heart Cry 12(m) Stmt., Exhibit R at p. 19) Hindustan provided Douglas with receipts for the contributions, acknowledging the transfers as "tax deductible." (*See* Pl.'s Hindustan 12(m) Stmt., Exhibit I (Hindustan Tax Receipts))

### INTERNATIONAL STUDENTS, INC.

International Students is a Colorado not-for-profit corporation located in Colorado Springs, Colorado. (*See* Pl.'s Hindustan 12(m) Stmt., Exhibit J (Affidavit of Gordon Loux, at ¶ 2)) Douglas made the following charitable contributions to International Students on the respectively indicated dates:

| Date | Dollar Amount |
| --- | --- |
| September 1, 1987 | 100.00 |
| October 1, 1987 | 100.00 |
| October 28, 1987 | 100.00 |
| October 30, 1987 | 1,200.00 |
| October 30, 1987 | 1,000.00 |
| December 2, 1987 | 100.00 |
| December 31, 1987 | 100.00 |
| January 4, 1988 | 100.00 |
| January 15, 1988 | 100.00 |
| January 28, 1988 | 100.00 |
| March 21, 1988 | 200.00 |
| March 21, 1988 | 50.00 |
| April 13, 1988 | 200.00 |
| May 2, 1988 | 200.00 |
| May 31, 1988 | 200.00 |
| July 1, 1988 | 200.00 |
| August 18, 1988 | 200.00 |
| September 23, 1988 | 200.00 |
| October 19, 1988 | 200.00 |
| November 1, 1988 | 1,000.00 |
| November 14, 1988 | 1,000.00 |
| December 5, 1988 | 1,000.00 |
| December 12, 1988 | 1,000.00 |
| January 6, 1989 | 1,000.00 |
| January 30, 1989 | 1,000.00 |
| April 5, 1989 | 1,000.00 |
| April 6, 1989 | 100.00 |
| April 24, 1989 | 100.00 |
| April 24, 1989 | 1,000.00 |
| April 28, 1989 | 100,000.00 |
| August 25, 1989 | 5,000.00 |
| August 25, 1989 | 200.00 |
| September 25, 1989 | 1,000.00 |
| September 25, 1989 | 200.00 |
| October 16, 1989 | 1,000.00 |
| October 16, 1989 | 200.00 |
| Total: | $120,450.00 |

(*See* Pl.'s Hindustan 12(m) Stmt., Exhibit C, ¶ 157; Exhibit J, ¶¶ 8, 10, 12; Exhibit K

(International Students' internal list of Douglas' donations); Exhibit L (copies of checks)) International Students deposited the monies into its account at First National Bank, Colorado Springs, Colorado, account no. 007799100. (*See Id.*, Exhibit L)

The monies transferred to International Students were monies Douglas obtained from D & S, AT Systems and AT Service. Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service, all the funds transferred to International Students were monies originating from one or more of those entities. (Douglas Dep., pp. 56–58, 1796–97)

In exchange for the transfers it received from Douglas, International Students provided no more than "an express or implied promise that his donation would be used for the tax-exempt purposes for which he designated his donations." (Pl.'s Hindustan 12(m) Stmt., Exhibit M (Resp. to Int. No. 2, at p. 6)) International Students provided no cash or other assets in exchange for the transfers. (Mark Affidavit, ¶ 7) Douglas claimed substantially all of the transfers made in 1988 as a deduction for charitable contributions on his 1988 federal income tax return. (*See* Pl.'s Heart Cry 12(m) Stmt., Exhibit R, at p. 19)

### PROCLAMATION INTERNATIONAL, INC.

Proclamation is a non-profit Florida corporation located in Pensacola, Florida. (*See* Pl.'s Hindustan 12(m) Stmt., Exhibit N (Affidavit of Donald Dunkerley, ¶¶ 2–3)) Beginning in approximately December 1988, Douglas was a member of Proclamation's "Advisory Board." (*See Id.*, Exhibit O (December 14, 1988 letter to Douglas from Dunkerley and memo to "PI Board and Advisors" from Dunkerley)) Douglas made the following charitable contributions to Proclamation on the respectively indicated dates:

| Date | Dollar Amount |
| --- | --- |
| November 9, 1987 | 753.13 |
| February 18, 1988 | 2,500.00 |
| September 20, 1988 | 6,000.00 |
| December 4, 1988 | 3,000.00 |
| December 4, 1988 | 5,000.00 |
| January 1, 1989 | 9,500.00 |
| February 13, 1989 | 11,475.00 |
| March 29, 1989 | 8,500.00 |
| Total: | $46,728.13 |

(*See Id.*, Exhibit C, ¶ 223; Exhibit P (Douglas checks payable to Proclamation); Pl.'s Heart Cry 12(m) Stmt., Exhibit Q, p. 13 (check no. 925), p. 14 (check no. 976)) Proclamation deposited the monies it received from Douglas into Proclamation's account at Citizens and Peoples National Bank, account no. 1011337. (Pl.'s Hindustan 12(m) Stmt., Exhibit P; Pl.'s Heart Cry 12(m) Stmt., Exhibit Q, p. 13 (check no. 925), p. 14 (check no. 976))

Patrick Grady, a salesperson for Douglas in connection with the sale of purported limited partnership interests in D & S, AT Systems and AT Service, received diverted assets from one or more of the receivership entities, which Grady in turn transferred to Proclamation on the following dates in the respectively indicated amounts:

| Date | Dollar Amount |
| --- | --- |
| January 28, 1988 | 2,000.00 |
| March 28, 1988 | 2,500.00 |
| Total: | $4,500.00 |

(*See* Pl.'s Hindustan 12(m) Stmt., Exhibit C, ¶ 224; Exhibit Q (dep. transcript of P. Grady, pp. 67–69, 169, 173); Exhibit R (checks issued to Proclamation by Grady with corresponding receipts); Exhibit S (1988 federal tax return of Patrick Grady)) Proclamation deposited the monies it received from Douglas through Grady in Proclamation's account at Citizens and Peoples National Bank in Pensacola, Florida, account no. 1011337. (*Id.*, Exhibit R)

The monies Douglas transferred to Proclamation, directly and indirectly through Grady, were monies Douglas obtained from D & S, AT Systems and AT Service. (*Id.*, Exhibit Q; Douglas Dep., pp. 1782–84) Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service (Pl.'s Heart Cry 12(m) Stmt., Exhibit F, at pp. 56–58), the funds Douglas transferred to Proclamation, directly and indirectly through Grady, were

monies originating from one or more of those entities.

In exchange for the transfers it received from Douglas, directly and indirectly through Grady, Proclamation provided no more than "an express or implied promise that his donation would be used for the tax-exempt purposes of [Proclamation] and, more specifically, for the purpose or purposes for which he designated his donations." (*See* Pl.'s Hindustan 12(m) Stmt., Exhibit T (Resp. to Int. No. 2, at p. 6)) Proclamation provided no cash or other assets in exchange for the transfers. (Mark Affidavit, ¶ 7) Douglas claimed at least the 1988 transfers as a deduction for charitable contributions on his 1988 federal income tax return. (*See* Pl.'s Heart Cry 12(m) Stmt., Exhibit R, at p. 19) Grady claimed both contributions he made to Proclamation as deductions for charitable contributions on his 1988 federal income tax return. (*Id.*, Exhibit Q, p. 173; Exhibit S, p. 4)

### HEART CRY INTERNATIONAL

Douglas made the following charitable contributions to Heart Cry on the respectively indicated dates:

| Date | Dollar Amount |
| --- | --- |
| October 4, 1988 | 11,485.00 |
| March 1989 | 1,000.00 |
| | |
| Total: | $12,485.00 |

(*See* Pl.'s Heart Cry 12(m) Stmt., ¶ 24) Heart Cry deposited the monies it received from Douglas into Heart Cry's account at First of America Bank, account no. 0902468801. (*Id.* ¶ 25) The monies transferred to Heart Cry were monies obtained from D & S, AT Systems and AT Service. (*Id.* ¶ 26) Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service, the funds transferred to Heart Cry were monies originating from one or more of those entities. Douglas claimed at least the October 4, 1988 transfer as a deduction for a charitable contribution on his 1988 federal income tax return. (*Id.*)

### WORLD VISION, INC.

Douglas made the following charitable contributions to World Vision on the respectively indicated dates.

| Date | Dollar Amount |
| --- | --- |
| March 16, 1988 | 7,500.00 |
| April 23, 1989 | 25,000.00 |
| October 20, 1989 | 25,000.00 |
| | |
| Total: | $57,500.00 |

(Pl.'s Heart Cry 12(m) Stmt., ¶ 37) World Vision deposited the monies it received from Douglas into its accounts at Bank of America, account no. 14620–01562 (*Id.* ¶ 38) The monies transferred to World Vision were monies Douglas obtained from D & S, AT Systems and AT Service. (*Id.* ¶ 39) Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service all the funds transferred to World Vision were monies originating from one or more of those entities.

For the transfers it received from Douglas, World Vision purportedly provided "an express or implied promise that his donation would be used for the tax exempt purpose of [World Vision] and, more specifically, for the purpose or purposes for which he designated his donations." (*Id.* ¶ 40)

World Vision provided Douglas with at least two "tax deductible receipts," one each for the April 23, 1989 and October 20, 1989 conveyances. (*Id.* ¶ 41) Douglas claimed the March 16, 1988 transfer as a deduction for a charitable contribution on his 1988 federal income tax return. (*Id.*)

### BETHANY EVANGELICAL FREE CHURCH

Douglas made the following charitable contributions to Bethany on the respectively indicated dates.

| Date | Dollar Amount |
| --- | --- |
| December 8, 1988 | 3,500.00 |
| March 8, 1989 | 16,380.00 |
| June 11, 1989 | 1,000.00 |
| September 27, 1989 | 5,000.00 |
| September 1989 | 1,000.00 |
| | |
| Total: | $26,880.00 |

(Pl.'s African Enterprise 12(m) Stmt., ¶ 27) Bethany deposited the December 8, 1988, March 8, 1989, June 11, 1989 and September 27, 1989 transfers it received from Douglas into Bethany's account at Bank One, formerly known as the First National Bank of Clintonville, account no. 110314. Bethany deposited the September 1989 transfer of $1,000 into Bethany's account at First State Bank, account no. 804–009–8. (*Id.* ¶ 28) The monies transferred to Bethany were monies Douglas obtained from D & S, AT Systems and AT Service. (*Id.* ¶ 29) Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service, the funds transferred to Bethany were monies originating from one or more of those entities. (*Id.*)

For the transfers it received from Douglas, Bethany purportedly provided "an express or implied promise that his donation would be used for the tax exempt purposes of [Bethany] and, more specifically, for the purpose or purposes for which he designated his donations." (*Id.* ¶ 30) Neither Douglas, D & S, AT Systems nor AT Service received any money or other assets from Bethany. (*Id.*) Douglas claimed at least the December 8, 1988, transfer as a deduction for a charitable contribution on his 1988 federal income tax return. (*Id.*)

### AFRICAN ENTERPRISE, INC.

Douglas made the following charitable contributions to African Enterprise on the respectively indicated dates.

| Date | Dollar Amount |
| --- | --- |
| October 18, 1988 | 25,000.00 |
| November 29, 1988 | 1,000.00 |
| January 11, 1989 | 25,000.00 |
| June 6, 1989 | 75,000.00 |
| October 10, 1989 | 40,000.00 |
| Total: | $166,000.00 |

(Pl.'s African Enterprise 12(m) Stmt., ¶ 23) African Enterprise deposited the monies it received from Douglas into African Enterprise's account at Bank of America, account no. 02303–016151. (*Id.* ¶ 24) The monies transferred to African Enterprise were monies Douglas obtained from D & S, AT Systems and AT Service. (*Id.* ¶ 25) Given that all Douglas' income from August 1987 to November 1989 was derived from D & S, AT Systems and AT Service, the funds transferred to African Enterprise were monies originating from one or more of those entities. (*Id.*)

For the transfers it received from Douglas, African Enterprise purportedly provided "an express or implied promise that his donation would be used for the tax exempt purposes of [African Enterprise] and, more specifically, for the purpose or purposes for which he designated his donations." (*Id.* ¶ 26) Neither Douglas, D & S, AT Systems nor AT Service received any money or other assets from African Enterprise. (*Id.*) Douglas claimed at least the October 18, 1988 and November 29, 1988 transfers as a deduction for charitable contributions on his 1988 federal income tax return. (*Id.*) African Enterprise issued Douglas a receipt for each donation noted above, acknowledging each transfer as a "tax deductible contribution to our ministry." (*Id.*)

## II. DISCUSSION [1]

### A. Evidentiary Issues

Defendants first argue that four exhibits plaintiff substantially relies upon are inad-

---

1. Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party opposing a motion for summary judgment must set forth specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). A genuine issue of material fact exists only where there is sufficient evidence favoring the non-moving party to support a jury verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All reasonable factual inferences must be viewed in favor of the non-moving party. *Holland v. Jefferson Nat'l. Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989). If the evidence presented by the non-movant is merely colorable or is not sufficiently probative, summary judgment

missible. The defendants argue that Scholes' affidavit and the affidavit of his retained accountant, Richard A. Mark, do not meet the requirements of Rule 56(e) or 28 U.S.C. § 1746. (Hindustan Mem. in Opp. to Pl.'s Mot. for Summ. J., at 2; *see* Affidavit of Steven S. Scholes attached as Exhibit B to Pl.'s Hindustan 12(m) Stmt.; Affidavit of Richard A. Mark attached as Exhibit A to Pl.'s Hindustan 12(m) Stmt.) This argument is unpersuasive and is rejected. The Affidavits meet all requirements of Rule 56(e) and 28 U.S.C. § 1746.

■ Hindustan and International Students next argue that the deposition of Douglas is inadmissible because "unsigned, unauthenticated, and unverified" and noticed and taken in another proceeding. They argue the deposition transcript, therefore, fails to comply with Federal Rules of Civil Procedure 30 and 32. The Receiver retorts that the deposition is admissible because Douglas "waived any irregularities in the signing of the transcript under FED.R.CIV.P. 32(d)(4)." (AE Reply Mem., at 3 (citing *Brown v. ASD Computing Center*, 519 F.Supp. 1096, 1098 (S.D.Ohio 1981), and *Kawietzke v. Rarich*, 198 F.Supp. 841, 842–43 (E.D.Penn.1961))) Scholes further responds that the court reporter certified the deposition transcript in compliance with Rule 30(f)(1). (AE Reply Mem., at 3; Exhibit H attached thereto (copy of certification)) Lastly, Scholes asserts that the deposition testimony may be offered as an affidavit even if not admissible as deposition testimony under Rule 32. (AE Reply Mem., at 4 (citing *Peterson v. Instapak Corp.*, 690 F.Supp. 697, 700 n. 4 (N.D.Ill.1988), *aff'd*, 902 F.2d 1232 (7th Cir.1990); *Hoover v. Switlick Parachute Co.*, 663 F.2d 964 (9th Cir.1981); and *Microsoft Corp. v. Very Competitive Computer Products*, 671 F.Supp. 1250, 1254 n. 2 (N.D.Cal.1987))) We agree with plaintiff. Although Douglas' deposition may not be admissible at trial as evidence, it is accepted

here as affidavit testimony. *See Peterson*, 690 F.Supp. at 700 n. 4.

■ Lastly, defendants object that the Indictment is inadmissible because it contains mere allegations. As such, defendants argue, the Indictment is conclusory, contains only hearsay and is of no probative value. Plaintiff responds by arguing only that defendants' argument is moot because plaintiff submitted a certified copy of the indictment and because it should be read in conjunction with the criminal judgment. The court agrees with defendants. *See United States v. Garcia*, 562 F.2d 411, 417 (7th Cir.1977) (indictment is not evidence). The allegations made in the Indictment will not be relied upon by the court as evidence in regards to the summary judgment motions.

## B. *Fraudulent Conveyances*

■ To recover the conveyances Douglas made to the defendants, the Receiver asserts a claim of fraudulent conveyance against each defendant. Governing this cause of action is the Illinois fraudulent conveyance statute in effect at the time the transfers were made and since repealed:

> Every gift, grant [or] conveyance ... made with intent to disturb, delay, hinder or defraud creditors or other persons ... shall be void as against such creditors, purchasers and other persons.

ILL.REV.STAT. ch. 59, ¶ 4 (1989) (repealed by P.A. 86–814, § 13 effective January 1, 1990). "In order to establish that a conveyance is fraudulent in law, three elements must be present: (1) there must be a transfer made for no or inadequate consideration; (2) there must be existing or contemplated indebtedness against the transferor; and (3) it must appear that the transferor did not retain sufficient property to pay his indebtedness." *Gendron v. Chicago & North Western Transp. Co.*, 139 Ill.2d 422, 151 Ill.Dec. 545, 553, 564 N.E.2d 1207, 1215, (1990).[2] The

---

is appropriate. *Wolf v. Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

**2.** Illinois law distinguishes conveyances that are "fraudulent in law," from those that are "fraudulent in fact." Conveyances are "fraudulent in fact" where consideration exists for the transfer, but an actual intent to defraud exists on the part

of the debtor, and the transferee willingly participates in the fraud. *Reagan v. Baird*, 140 Ill. App.3d 58, 65, 94 Ill.Dec. 151, 157, 487 N.E.2d 1028, 1034 (4th Dist.1985). Plaintiff in this case makes no claim for a conveyance "fraudulent in fact."

parties do not dispute that Douglas conveyed funds to the defendants. The defendants challenge the Receiver's proof of every other element of this claim.

### 1. *Existing or Contemplated Indebtedness Against the Transferor*

 Defendants forward three discernable arguments in support of their position that no indebtedness existed at the times of the conveyances. Defendants argue first that the Receiver cannot assert the prior judgments rendered against Douglas because the Receiver does not represent those creditors. Defendants next argue that the Receiver ignored Douglas' assets when determining Douglas' financial status. Lastly, defendants argue that the Receiver has not sufficiently identified investors or their claims. The first two arguments can be disposed of summarily. First, the Receiver need not represent Douglas' creditors in order to assert, as a factual matter, that the claims existed and, thus, that the transferor was indebted. This argument is rejected. Second, defendants' argument that the Receiver ignored Douglas' assets is without merit. The only citation in support of this argument is to a purported affidavit of Douglas which was stricken by this court. This assertion is, therefore, disregarded. Furthermore, defendants argue that the money Douglas misappropriated from the entities should be considered an asset of Douglas to offset any creditors' claims. (*See, e.g.*, Mem. of Certain Defs. in Supp. of Mot. for Summ. J., at 10–11 and n. 7) This is a *non sequitur.* Douglas' unlawful withdrawal of the funds from the entities gave rise to claims by the entities and investors against Douglas for those funds. To argue that once Douglas gained possession of the ill-gotten gains the funds became assets of Douglas is incongruous. Defendants have offered absolutely no evidence showing, or tending to show, that Douglas' receipt of the funds he took from the entities was in any way legitimate or could in any way be characterized as valid. This argument is therefore rejected.

As to the argument that the Receiver has not identified any creditors existing at the times of the conveyances, the Receiver replies that to establish the required indebted-ness "a plaintiff need only establish a party with a subsisting claim against the debtor at the time of the conveyance ... even though his claim may not have matured or been reduced to judgment until after the conveyance was made." (Pl.'s Mem. in Supp. of Mot. for Summ. J. against Heart Cry and World Vision, at 6 (citing *Indiana National Bank v. Gamble*, 612 F.Supp. 1272, 1277 (N.D.Ill.1984))) Plaintiff argues that the receivership entities had contemplated or existing indebtedness at the time of each conveyance because, due to Douglas' scheme to defraud, investors had breach of contract claims and fraud claims against Douglas and the entities from the inception of the scheme. (Pl.'s Mem. in Supp. of Mot. for Summ. J. against Hindustan defendants, at 7–8 (citing *Kennard v. Curran*, 239 Ill. 122, 87 N.E. 913, 916 (1909) ("all claims which arise from contract are in force from the date of the agreement"); and (*Menconi v. Davison*, 80 Ill. App.2d 1, 225 N.E.2d 139 (1st Dist.1967)) The court agrees with plaintiff. No genuine issue of material fact exists as to whether there existed an actual or contemplated indebtedness against the transferor at the times of the transfers.

 Douglas conveyed more than half of a million dollars to these defendants. The money did not belong to Douglas. During the operation of the receivership entities, Douglas had no income other than the funds he took from the entities. (Douglas Dep., at pp. 56–58) The money originated with investors who attempted to invest the money with the receivership entities. Upon transferring their funds to Douglas and/or the entities, the investors entered into limited partnership agreements with Douglas and the entities. (*See* Pl.'s Heart Cry 12(m) Stmt., ¶ 15 and Exhibit K (copies of limited partnership agreements)) As either the general partner or as the person who controlled the general partner of the purported limited partnerships, Douglas owed the investor partners and the entities a fiduciary duty of good faith. *See Bane v. Ferguson*, 707 F.Supp. 988, 996 (N.D.Ill.) (under Illinois law, "all partners are fiduciaries for one another"), *aff'd*, 890 F.2d 11 (7th Cir.1989); *Fisher v. Samuels*, 691 F.Supp. 63, 73 (N.D.Ill.1988);

*Labovitz v. Dolan,* 189 Ill.App.3d 403, 408, 136 Ill.Dec. 780, 784, 545 N.E.2d 304, 308 (1st Dist.1989). When Douglas withdrew the funds from the entities with the intent of expending the funds for his own purposes, he breached his duties to the entities. (Plea Agreement, ¶ 5) Thus, when the expenditure of the funds coincided with his intent to dissipate the funds in a manner inconsistent with his fiduciary responsibilities, contemplated indebtedness arose in favor of the entities against Douglas. Thus, indebtedness arose against Douglas and the entities when Douglas misappropriated funds belonging to the entities and conveyed these funds to the defendants.

For the foregoing reasons, Scholes has shown, and the defendants have failed to rebut, that no genuine issue of material fact exists that actual and contemplated indebtedness against Douglas and the receivership entities existed at the times of the conveyances alleged.

### 2. *The Transferor Did Not Retain Sufficient Property to Pay the Indebtedness*

Scholes argues that to satisfy this element, he need only show that "the conveyance *tended to . . .* impair the rights of creditors". (Pl.'s Mem. in Supp. of Mot. for Summ. J. against Hindustan defendants, at 9–10 (emphasis added) (citing *Tcherepnin v. Franz,* 457 F.Supp. 832, 840 (N.D.Ill.1978); *Birney v. Solomon,* 348 Ill. 410, 414, 181 N.E. 318, 320 (1932); *Cairo Lumber Co. v. Ladenberger,* 313 Ill.App. 1, 6, 39 N.E.2d 596, 599 (4th Dist.1941))) He further argues that the conveyances at issue not only tended to impair creditors' rights but did, in fact, injure creditors because Douglas was insolvent at all relevant times. Scholes asserts Douglas was insolvent "both in the sense that his liabilities exceeded his assets and in the sense that he was unable to pay his debts as they came due." (Pl.'s Mem. in Supp. of Mot. for Summ. J. against Hindustan defendants, at 10) In support, the Receiver proffers copies of judgments against Douglas showing over $28,000 of judgments existed against him when he initiated the fraudulent investment scheme. He also tenders Douglas' deposition

in which Douglas testifies that he had no income during the existence of the scheme other than the funds that he misappropriated from the receivership entities. (Pl.'s Hindustan 12(m) Stmt., at ¶ 10) Scholes further proffers the affidavit of an accountant, Richard A. Mark, in which Mark testifies that Douglas was insolvent during all relevant times. (*Id.,* at ¶ 10 (citing Mark Dep. at ¶ 3)) Plaintiff argues this evidence demonstrates Douglas was insolvent during the entire scheme and, thus, he was insolvent when he made the conveyances.

■ In response, defendants forward the same arguments they asserted in opposition to Scholes' averment that Douglas and the entities had existing or contemplated indebtedness. As stated above, these arguments fail. Defendants argue that the Receiver "disregards Douglas' *assets* (12(n) [Stmt.], ¶ A.9)". (Defendants Hindustan and International Students' Mem. in Opp., at 9) As stated above, this bald statement, without more, cannot create a genuine issue of material fact. Therefore, this argument cannot work to defeat summary judgment. Defendants cite no facts in support of their conclusory arguments that Douglas and the receivership entities retained sufficient assets to pay their creditors.

Defendants' only argument in opposition to this element which requires further discussion is that Mark, when concluding that Douglas and the entities were insolvent, made invalid assumptions. (*See, e.g.,* Hindustan Defs.' 12(n) Stmt., at 20–22) In his deposition testimony, Mark attested that he assumed, when conducting his solvency analysis, that Douglas and the entities "had an obligation to repay to the investors all of the funds that the investors had invested." (Mark Affidavit, at 63, attached as Exhibit 5 to Hindustan Defs.' 12(n) Stmt.) Mark further attested that, if these obligations did not exist, then D & S, AT Systems and AT Service would each in 1987, 1988 and 1989 "have been in a position in which assets exceeded liabilities". (*Id.,* at 67) Without discrediting the assumption itself, defendants argue solely that Mark's conclusions are invalid because based on mere assumption. (*See* Certain Defs.' Reply Brief in Supp. of

Mot. for Summ. J., at 9–11) Defendants offer no evidence to contradict the assumption.

■ We agree with the assumption made by Mark and find that Douglas and the entities were insolvent at all relevant times. From January 1987, when Douglas was released from prison after serving a sentence for an unrelated fraud, until August 1987 when Douglas created D & S and began the purported investment scheme, Douglas earned $10,060.48 legitimately. (Pl.'s Hindustan 12(m) Stmt. at ¶ 9; Douglas Dep., at pp. 53–55) At the time of his release from prison in 1987, judgments in the aggregate amount of at least $28,166.06 existed against him. (*Id.,* at ¶ 8) None of those judgments has been satisfied. *Id.* Furthermore, Douglas has admitted, and no party has controverted, that Douglas had no legitimate source of income from August 1987 through November 1989, when the scheme terminated and Scholes was appointed Receiver. (*Id.* at ¶ 10) Any assets possessed by Douglas from August 1987 to November 1989 were obtained wrongfully from the receivership entities. (*Id.*) Furthermore, the entities were created by Douglas solely to perpetrate fraud. (Plea Agreement, ¶ 5) As such, the investors did, indeed, have claims for their investments from the time they invested and executed the investment agreements. Additionally, although defendants imply that Douglas did consummate some legitimate investment transactions on behalf of the entities, they have wholly failed to substantiate such claims. Even if such transactions occurred, however, defendants no where contend that the transactions rendered Douglas or the entities solvent. As such, this element of plaintiff's fraudulent conveyance claims has been demonstrated as a matter of law.

### 3. *No or Inadequate Consideration*

The Receiver alleges that defendants gave no valuable consideration for the conveyances. Defendants assert that they gave consideration or its equivalent for the conveyances. The parties do not dispute that the defendants gave Douglas and the entities no valuable assets in exchange for the conveyances by Douglas. Defendants argue that the consideration they provided "consists of ...

some forbearance, detriment, loss or responsibility given, suffered or undertaken by" them. (*See, e.g.,* Hindustan Defs.' Mem. in Opp. to Pl.'s Mem. in Supp., at 5 (citing *Lipkin v. Koren,* 392 Ill. 400, 406, 64 N.E.2d 890, 893 (1946))) According to defendants, they were required by law, as non-profit, tax-exempt organizations, to use the conveyed funds in accordance with their charters. (*See, e.g.,* Hindustan Defs.' Mem. in Opp. to Pl.'s Mot. for Summ. J., at 6 (referring to "state law and § 501(c)(3) of the Internal Revenue Code")) They argue that "each time [a defendant] accepted a contribution, it assumed the duty, responsibility or detriment of using that contribution not for its own benefit, but for the purpose for which that contribution was designated or, if the contribution was not designated, for the charitable purposes for which the organization existed". (*Id.,* at 7) This, they argue, constitutes consideration for the conveyances. Finally, defendants argue, even if their charitable legal requirements do not constitute consideration, the doctrine of promissory estoppel does because it is "usually considered as a substitute for consideration". (*Id.,* at 8 (citing *Bank of Marion v. Robert "Chick" Fritz, Inc.,* 57 Ill.2d 120, 124, 311 N.E.2d 138, 140 (1974))) Defendants' arguments fail.

■ First, mere compliance with the law does not constitute consideration. *See W.H. Lyman Constr. Co. v. Village of Gurnee,* 131 Ill.App.3d 87, 86 Ill.Dec. 276, 282, 475 N.E.2d 273, 279 (2d Dist.1985); *Adams v. Lockformer Co.,* 167 Ill.App.3d 93, 117 Ill.Dec. 826, 828–29, 520 N.E.2d 1177, 1179–80 (1st Dist.1988). Although as a general proposition defendants are correct that forbearance can constitute consideration in a contractual setting, that tenet does not extend to the performance of one's statutorily required duty nor does it extend to the circumstances of this case. Any forbearance undertaken or detriment incurred by a party must be bargained for, and arise as a result of the transaction, to constitute consideration. *Tcherepnin,* 457 F.Supp. at 837; *Bank of Marion,* 311 N.E.2d at 139–40. The forbearance or detriment asserted by each defendant was not something for which the defendants bargained and the defendants do

not so argue. Indeed, as asserted by the defendants, the detriment each incurred was required by law of all charitable organizations. Therefore, the characterization defendants place on their donations—that the funds constituted a duty or responsibility on their parts—does not rise to the level of legally cognizable consideration.

Second, promissory estoppel does not act as a substitute for consideration in this case. Promissory estoppel applies where a promise is made which induces reasonable reliance by the promisee. *Bank of Marion,* 311 N.E.2d at 140. In such case, promissory estoppel may be a substitute for consideration thus enabling the promisee to sue on the promise. *Id.* This is not such a case. In this case, defendants do not even assert a promise upon which they reasonably relied. The most defendants aver is that "Douglas, either explicitly ... or implicitly ... indicated that the contributions were to be used for specific purposes". (Mem. of Certain Defs. in Supp. of their Mot. for Summ. J., at 9) This "indication" cannot constitute consideration. Defendants' argument that their unspecified reliance on some uncited promise constitutes consideration in this action is rejected.

Furthermore, as the Receiver notes, only valuable consideration will negate a charge of fraudulent conveyance under the Illinois statute as interpreted by Illinois courts. *See, e.g., Tcherepnin v. Franz,* 475 F.Supp. 92, 97 (N.D.Ill.1979) (court compared the monetary value of the property conveyed to legal value of consideration received by grantor); *Gamble,* 612 F.Supp. at 1276 (same); *Thompson v. Williams,* 6 Ill.2d 208, 215, 127 N.E.2d 457, 461 (1955) (same); *Reagan v. Baird,* 140 Ill.App.3d 58, 94 Ill.Dec. 151, 157–58, 487 N.E.2d 1028, 1034–35 (4th Dist.1985) (same); *Effingham State Bank v. Blades,* 139 Ill.App.3d 259, 93 Ill.Dec. 764, 768, 487 N.E.2d 431, 435 (5th Dist.1985) (same); *Hormberger v. Blackwell,* 241 Ill. App. 398, 401 (4th Dist.1926) (same); *Oswald v. Nehls,* 233 Ill. 438, 84 N.E. 619, 622 (1908) (love and affection is not adequate consideration); *Cairo Lumber Co. v. Ladenberger,* 313 Ill.App. 1, 39 N.E.2d 596, 599 (4th Dist. 1941) (same); *see also Zahra Spiritual Trust v. United States,* 910 F.2d 240, 248–49 (5th Cir.1990) (under similar Texas law, court focuses on monetary, not spiritual, consideration to decide if conveyance to a charitable trust was fraudulent). The purpose for this seems clear. Only consideration of substantially equivalent value leaves the debtor in a financially similar position after the conveyance. A conveyance made for consideration of nominal or no monetary value leaves the debtor in a much weakened financial position which hinders his creditors. *See United States v. Kitsos,* 770 F.Supp. 1230, 1235–36 n. 14 (N.D.Ill.1991) ("relevant determination is whether *full* value has been given"). This is precisely the scenario the statute attempts to prevent. Recognizing consideration of no monetary value as a defense to a fraudulent conveyance would emasculate the statute. The Receiver has shown that, as a matter of law, the defendants gave no consideration for the transfers at issue.

Lastly, defendants argue that plaintiff's claims for fraudulent conveyance must fail because the exclusive remedy is retrieval of the property transferred but that defendants no longer possess the actual funds. (Mem. of Certain Defs. in Supp. of Their Mot. for Summ. J., at 12–13) Thus, defendants argue, plaintiff's claims must fail. We disagree. *See Tcherepnin v. Franz,* 489 F.Supp. 43, 45 (N.D.Ill.1980) ("well-settled" that creditor may elect to recover property itself or its cash value). A personal judgment against the transferee is appropriate.

For all the foregoing reasons, the court grants the plaintiff's motions for summary judgment on his claims for fraudulent conveyances against defendants African Enterprise, Inc., Bethany Evangelical Free Church, Heart Cry International, Hindustan Bible Institute, Inc., International Students, Inc., Proclamation International, and World Vision, Inc. Defendants' motions for summary judgment on the Receiver's claims for fraudulent conveyance are denied.

## C. *Unjust Enrichment*

Also asserted by the Receiver against each defendant is a claim for unjust enrichment. Because the court has found that the Receiv-

er is entitled to judgment on his fraudulent conveyance claims, however, we need not pass upon the claims for unjust enrichment. All parties' motions are denied as to the claims for unjust enrichment.

## III. CONCLUSION

For the reasons expressed, the Receiver's Motion for Summary Judgment Against Hindustan Bible Institute, Inc., International Students, Inc., and Proclamation International, Inc. and the Receiver's Motion for Summary Judgment Against African Enterprise, Inc. and Bethany Evangelical Free Church, and the Receiver's Motion for Summary Judgment Against Heart Cry International and World Vision, Inc. are granted. The Motion of Certain Defendants for Summary Judgment and the Motion for Summary Judgment of Proclamation International Inc. and Bethany Evangelical Free Church are denied. Judgment is entered on Counts I, IV, XIX, XXII, XXV, XXXVII and XLVI of the plaintiff's First Amended Complaint in favor of the Receiver Steven S. Scholes and against defendants African Enterprise, Inc., Bethany Evangelical Free Church, Heart Cry International, Hindustan Bible Institute, Inc., International Students, Inc., Proclamation International, Inc., and World Vision, Inc., in the following amounts.

| Defendant | Judgment Amount |
| --- | --- |
| African Enterprise, Inc. | $166,000.00 |
| Bethany Evangelical Free Church | $ 26,880.00 |
| Heart Cry International | $ 12,485.00 |
| Hindustan Bible Institute, Inc. | $ 74,989.25 |
| International Students, Inc. | $120,450.00 |
| Proclamation International, Inc. | $ 51,228.13 |
| World Vision, Inc. | $ 57,500.00 |

This court finds that there is no just reason for delay, and therefore the clerk is directed to enter final judgment against the defendants pursuant to FED.R.CIV.P. 54(b).